[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-14013
_____

D.C. Docket No. 1:00-md-01334-FAM

In Re: MANAGED CARE, et al.

_____

MEDICAL ASSOCIATION OF GEORGIA,
CALIFORNIA MEDICAL ASSOCIATION, et al.,

Plaintiffs - Appellants,

versus

WELLPOINT, INC.,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 18, 2014)

Before MARTIN and JORDAN, Circuit Judges, and BAYLSON,[*] District Judge.

BAYLSON, District Judge:

## I.    INTRODUCTION

The issue before us is whether the District Court abused its discretion in finding Appellants in contempt for violating the terms of a prior Settlement Agreement.

Underlying this overarching issue is a complex, twelve-year-old, multidistrict litigation; a related multidistrict litigation pending in another federal district court; and whether the District Court reasonably interpreted the Settlement Agreement in the first action.

### A. MDL 1334

In 2000, a number of physicians and physician associations initiated a group of class actions against various providers of health plans, which were consolidated into a multidistrict litigation and assigned to the Southern District of Florida ("District Court").   In re Managed Care Litig., No. 1:00-md-01334 (S.D. Fla. Apr. 17, 2000) ("MDL 1334").  The parties settled that lawsuit in 2005, resulting in a Settlement Agreement and an Order issued by the Southern District of Florida approving that Settlement Agreement.

---

[*] Honorable Michael M. Baylson, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

### B. The UCR MDL

In 2009, another group of physicians and physician associations – including Appellants – filed multiple lawsuits against, Appellee, WellPoint, Inc. ("WellPoint"), which were consolidated into a multidistrict litigation in the Central District of California.  In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig., No. 2:09-ml-02074 (C.D. Cal. Aug. 20, 2009) ("UCR MDL").

### C. The Present Dispute

The present dispute involves the propriety of the District Court's Order holding Appellants in contempt and imposing sanctions for the violation of an injunction.  An earlier Order from the District Court barred Appellants from pursuing their claims in the UCR MDL, because the District Court found that the claims had been released by the Settlement Agreement reached by the parties in MDL 1334.  When Appellants refused to withdraw those claims as directed, the District Court held Appellants in contempt and imposed sanctions.

For the reasons stated below, we affirm the judgment of the District Court in large part, but vacate the Injunction as to Appellants' ERISA claims insofar as they hinge on the denial or underpayment of benefits following the Settlement Agreement's Effective Date (as defined below), and remand to the District Court for a determination of which ERISA claims can proceed in view of this opinion and for reconsideration of the imposition of sanctions.

3

## II.    PROCEDURAL HISTORY

### A. MDL 1334

#### 1.  MDL 1334 Allegations

In 2000, physicians and physician associations initiated an action in the Southern District of Florida against a group of healthcare insurance companies, including WellPoint, on behalf of a nationwide class of physicians.  This action was later consolidated into a multidistrict litigation in April 2000.  The class representatives alleged that these insurance companies engaged in a conspiracy by means of mail and wire fraud to inflate profits by systematically denying, delaying, and diminishing payments due to them and that "the conspiracy was conducted through and implemented by" several means, including "the development and utilization of automated and integrated claims processing and other systems such as those generated by" the company Ingenix.[1]  MDL 1334 D.E. 1607 ¶ 120.[2]

#### 2.  Settlement Agreement

In 2005, WellPoint settled the MDL 1334 claims on a national, class-wide basis, agreeing to pay $198 million to the class and class counsel and promising to

---

[1] Ingenix is a nationwide healthcare information company that sells pricing schedules to medical providers, healthcare insurers, and others.  UCR MDL D.E. 113 (Second Consol. Am. Compl.) ¶ 116.  Ingenix creates its pricing schedules by relying on its database, which compiles provider charge data regarding various medical procedures throughout the country that it receives from health insurance companies.  Id. ¶ 103-113.  The Second Consolidated Amended Complaint alleges that the conspirators used and manipulated the Ingenix database to systematically under-reimburse for services.  Id. ¶ 114.

[2] We adopt the above citation method to differentiate between citations to the two different MDL dockets.  Throughout this opinion, where we cite to page numbers of docket entry items, we refer to the ECF generated page number.

make a wide range of changes to its business practices, including changes to the method used to determine usual, customary, and reasonable ("UCR") rates. MDL 1334 D.E. 4321 ("Settlement Agreement") §§ 7, 8.1, 8.2, 9.1, 16. WellPoint specifically "agree[d] that, to the extent it uses Physician charge data to determine the usual, reasonable, and customary amount to be paid for services performed by Non-Participating Physicians, it will not use any internal claims database" that systematically underprices claims. Settlement Agreement § 7.14(d).

In exchange, the class agreed to release all claims related to the allegations underlying MDL 1334 once the Settlement Agreement took effect. Section 13.1(a) of the settlement agreement defines a "released claim" and provides:

> [Released Parties shall be released] from any and all causes of action, judgments, liens, indebtedness, costs, damages, obligations, attorneys' fees, losses, claims, liabilities and demands of whatever kind or character (each a "Claim"), arising on or before the Effective Date, that are, were or could have been asserted against any of the Released Parties by reason of, arising out of, or in any way related to any of the facts, acts, events, transactions, occurrences, courses of conduct, representations, omissions, circumstances or other matters referenced in the Actions . . . .

Id. § 13.1(a). The next subsection, applicable only to claims against the Blue Cross Blue Shield Association ("BCBSA"), further provided that:

> The Releasing Parties further agree to forever abandon and discharge any and all Claims that exist nor or that might arise in the future against BCBSA . . ., which Claims arise from, or are based on, conduct by any of the Released Parties that occurred on or before the Effective Date and are, or could have been, alleged in the Complaints,

5

whether any such Claim was or could have been asserted by any Releasing Party on its own behalf or on behalf of other Persons.

Id. § 13.1(b).

The Settlement Agreement further provides:

Each Class Member who has not validly and timely requested to Opt-Out of this Agreement and each Signatory Medical Society may hereafter discover facts other than or different from those which he, she or it knows or believes to be true with respect to the claims which are the subject matter of the provisions of § 13, but each such Class Member and each Signatory Medical Society hereby expressly waives and fully, finally and forever settles and releases, upon the entry of Final Order and Judgment, any known or unknown, suspected or unsuspected, contingent or non contingent claim with respect to the subject matter of provisions of § 13, whether or not concealed or hidden, without regard to the discovery or existence of such different or additional facts.

Id. § 13.5(b).

### 3.  Notice to Class Members

The District Court preliminarily approved the settlement, MDL 1334 D.E. 4336, and notice was mailed to potential class members in August 2005.  The notice stated:

> IF YOU ARE A PHYSICIAN WHO PROVIDED COVERED SERVICES TO ANY INDIVIDUAL ENROLLED IN OR COVERED BY CERTAIN HEALTH CARE PLANS AT ANY TIME BETWEEN AUGUST 4, 1990 AND JULY 15, 2005 . . . PLEASE READ THIS NOTICE CAREFULLY.

MDL 1334 D.E. 4608 at 62.

In the section describing the claims released against WellPoint, the notice stated that they consisted of claims "arising on or before the date that the Court's

6

order approving the settlement becomes final, that are, were or could have been asserted." Id. at 65. The next sentence added that certain "claims that exist now or that might arise in the future" are waived against the Blue Cross and Blue Shield Association ("BCBSA"). Id. The notice also stated that the District Court would hold a hearing in which it "will consider whether to enter orders that would prevent members of the Class and certain other persons, including the Defendants in the Actions other than WellPoint, from asserting certain claims against WellPoint in the future." Id. at 66. The notice further described how to obtain additional information about the proposed settlement.

### 4. Approval of Settlement Agreement

In November 2005, one month after the deadline for filing objections or opting out of the class, the parties filed a joint motion for the court's final approval of the settlement. MDL 1334 D.E. 4608. Among other things, the joint motion: (1) recited the obligation of the insurance companies to change their business practices, id. at 10-17; (2) asked the District Court to overrule the limited objections filed by class members, id. at 29-49; and (3) advised the District Court that one objector was "simply wrong that the release [was] too broad," id. at 44.

The District Court approved the Settlement Agreement in an Amended Order issued on January 3, 2006. MDL 1334 D.E. 4684 (the "Injunction"). The Order enjoined the class members – "Released Parties" under the Settlement

7

Agreement – from participating in lawsuits "arising out of or relating in any way to the Released Claims." Id. ¶¶ 2, 5, 18.  Generally tracking the language in the class notice, the amended order approving the settlement noted that the agreement released claims "that exist now or that might arise in the future against BCBSA," id. ¶ 6, and released claims against WellPoint "that are, were or could have been asserted against any of the Released Parties by reason of, arising out of, or in any way related to" the facts at issue in MDL 1334.  Id. ¶ 5.  The District Court retained jurisdiction on "all matters relating to (a) the interpretation, administration, and consummation of the Settlement Agreement and (b) the enforcement of the injunctions described." Id. ¶ 27.

## B. UCR MDL

In 2009, Appellants – three medical associations and three physicians, who had been members of the settlement class in MDL 1334 – joined with other plaintiffs to file multiple lawsuits against WellPoint regarding alleged underpayment for the provision of medical services.  The Judicial Panel on Multidistrict Litigation consolidated those lawsuits into the UCR MDL, a separate multidistrict litigation in California.  Plaintiffs filed the First Consolidated Amended Complaint on November 2, 2009, in which the physicians brought ERISA claims under § 1132(a)(1)(B), the medical associations brought various

8

state law claims, and all plaintiffs brought RICO and antitrust claims.  UCR MDL

D.E. 12.

The UCR MDL plaintiffs then filed a Motion for Leave to File a Second

Consolidated Amended Complaint on June 28, 2010.  UCR MDL D.E. 113.  On

July 12, 2010, the district court granted the plaintiffs' motion and deemed the

Second Consolidated Amended Complaint filed as of that day.  UCR MDL D.E.

124.  The Second Consolidated Amended Complaint reiterated the allegations of

the First Amended Consolidated Complaint, setting forth allegations that

WellPoint had engaged in a conspiracy with other managed care companies to

systematically set artificially reduced rates by using the Ingenix database to price

claims, thus under-reimbursing physicians for certain medical services, in violation

of the Sherman Act, ERISA, and various state laws.[3]  UCR MDL D.E. 113-1.

Specifically, the Second Consolidated Amended Complaint alleged that:

- Defendants and the Conspirators entered into secret and intentionally concealed agreements to depress reimbursements for [out-of-network services or "ONS"].  The conspiracy and illegal conduct result in invoicing of inflated and improper charges to and out-of-pocket payments made by and for healthcare providers.  The conspiracy and

---

[3] The allegations at issue in MDL 1334 covered a broader range of conduct than the UCR MDL.  Nevertheless, at least some of the allegations in MDL 1334 closely relate to the UCR MDL allegations currently at issue.  For example, in language very similar to the UCR MDL allegations, the MDL 1334 plaintiffs alleged that WellPoint and others engaged in an "automated scheme to deny and reduce payments to doctors" that was "conducted through and implemented by . . . the development and utilization of automated and integrated claims processing and other systems such as those generated by . . . Ingenix . . . and the configuration and use of such systems to similarly deny, diminish and delay payments to physicians . . . ."  MDL 1334 D.E. 4661 (Third Amended Consolidated Class Action Complaint) ¶¶ 82-83.

9

illegal conduct also results in underpayment of healthcare providers for services rendered … . Id. ¶ 67.

- Plaintiffs' claims in this case are directed at a secret, illegal agreement and deceptive scheme involving Defendants and most of the country's largest health insurers to systematically under-reimburse for ONS. During the Relevant Time Period [defined as "1998 to the present," id. ¶ 26], the Insurer Conspirators agreed to fix the UCRs used to reimburse for ONS at artificially low levels. Pursuant to this agreement, Defendants and their Conspirators knowingly created a flawed system that uses limited amounts of manipulated data to artificially depress reimbursement rates for ONS. Id. ¶ 70.

- Unbeknownst to Plaintiffs, healthcare consumers and providers nationwide, Defendants and the Conspirators have conspired to ensure that the UCR pricing schedules generated by Ingenix are artificially low ("False UCRs"). When the Insurer Conspirators then use those schedules to calculate ONS reimbursements, the resulting payments to subscribers and providers are artificially low and substantially below the actual UCR for similar services in the relevant geographic area. Id. ¶ 72.

- Defendants engaged in price fixing when they agreed with their Conspirators to utilize precisely the same flawed database to determine the UCR amounts for out-of-network medical services, which lead to them paying substantially reduced amounts for services rendered to their subscribers. Id. ¶ 86.

- The way in which the Ingenix Database has operated and continues to operate, and the manner in which the Insurer Conspirators utilize the Ingenix Database, demonstrate that the anticompetitive agreement to establish False UCRs persists to the present. Id. ¶ 115.

- WellPoint breached its fiduciary duties by failing to disclose the actual and true reimbursement rules used to pay ONS benefits by knowingly using inaccurate, flawed and fabricated data from the Ingenix Database to calculate UCRs, by knowingly delegating their duty to collect accurate information regarding UCRs to Ingenix (whom WellPoint knew was collecting inadequate and inaccurate data regarding UCRs), and by failing to fulfill its obligations of good faith, due care and loyalty. Moreover WellPoint breached its duties by manipulating the data it used to pay ONS so as to artificially depress

the data Ingenix relied upon in creating UCR schedules for ONS reimbursements.  Id. ¶ 178.

- In processing claims of ONS charges, WellPoint is obligated under ERISA to calculate accurate UCRs and reimburse subscribers accurately ICRs in a manner consistent with the definition of UCR used by WellPoint to describe its health plans to its plan subscribers. WellPoint does not fulfill this obligation because it fails to pay benefits based on accurate UCRs.  Id. ¶ 196.

- The WellPoint-Ingenix Enterprise was formed in 1998, at the time of the sale of the PHCS database by HIAA to Ingenix," and "[a]t all relevant times, the Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).  Id. ¶ 291.

### C. Motion to Enjoin UCR MDL Plaintiffs

WellPoint took the position that both the Settlement Agreement reached in MDL 1334, and the District Court's January 3, 2006 Order approving that Settlement Agreement, barred the UCR MDL plaintiffs from pursuing their claims in the UCR MDL.  WellPoint thus filed a Motion to Enforce the Injunction Against Physician Plaintiffs in the Southern District of Florida, seeking to enforce that January 3, 2006 Order against the UCR Plaintiffs.   MDL 1334 D.E. 6053.

### 2.  UCR Plaintiffs Ordered to Withdraw Claims

On August 15, 2010, after consideration of WellPoint's Motion to Enforce the Injunction, MDL 1331 D.E. 6053, Magistrate Judge Torres issued a Report and Recommendation ("R&R"), recommending that the District Court grant WellPoint's Motion and order the California MDL plaintiffs, including Appellants,

11

to withdraw their claims.[4]  MDL 1334 D.E. 6116.  Judge Torres found that, "as indicated by the broad release language of the Settlement Agreement, Plaintiffs have released all of their claims based on WellPoint's alleged improper UCR calculations . . . ."  Id. at 17.  Pursuant to this understanding, Judge Torres also found that "the RICO and antitrust claims clearly fall within the scope of Released Claims . . . because they all relate to WellPoint's conspiracy to systematically under-compensate the non-participating parties," id. at 10, and that "Plaintiffs' ERISA and contractual claims asserted in the UCR [MDL] all pertain to WellPoint's practices regarding the fee-for-service claims and the calculation of UCRs," or "the very same practices" that were "expressly addressed in the *In re Managed Care* Complaints," id. at 16.  Judge Torres also noted that "[i]n no way does the Release immunize WellPoint from liability against new RICO, antitrust or contractual violations that arise from a brand new set of events and course of conduct than the one settled in the MDL Litigation."  Id. at 22.

---

[4] In 2009, Judge Torres issued two related R&Rs, concluding that broad releases in similar In re Managed Care settlement agreements barred subsequent RICO and antitrust claims. MDL 1334 D.E. 6022 (R&R on Settling Def. CIGNA's Mots. to Enforce Injunction); MDL 1334 D.E. 6023 (R&R on Settling Def. CIGNA's Mot. to Enforce Injunction).  Judge Moreno adopted both of those R&Rs.  MDL 1334 D.E. 6032-33.  Plaintiffs appealed both Orders but this Court dismissed those appeals due to lack of appellate jurisdiction.  Klay (AMA et al.) v. All Defendants, No. 09-16261 (11th Cir. June 16, 2010) (per curiam); Klay (Higashi) v. All Defendants, No. 09-16302-E (11th Cir. Apr. 21, 2010).

On March 8, 2011, the District Court adopted Judge Torres' R&R and ordered the plaintiffs in the UCR MDL to withdraw their claims against WellPoint within 20 days or else be found in contempt.  MDL 1334 D.E. 6190.

A number of the UCR MDL plaintiffs withdrew their claims, but Appellants did not.

### D. Motion to Find Appellants in Contempt and Impose Sanctions

On September 19, 2011, after Appellants and certain other plaintiffs still had not withdrawn their claims in the UCR MDL, WellPoint moved the District Court to find Appellants and the other noncompliant plaintiffs in contempt.  D.E. 6264. On October 17, 2011, the UCR MDL plaintiffs filed the Third Consolidated Amended Complaint.  UCR MDL D.E. 274.  On January 10, 2012, the District Court granted WellPoint's motion, found the noncompliant plaintiffs in contempt, and scheduled a sanctions hearing.  MDL 1334 D.E. 6303.  The parties submitted extensive briefing on the question of sanctions and the propriety of the underlying finding of contempt.  MDL 1334 D.E. 6313, 6316, 6318, 6327, 6328, 6329, 6331, 6334, 6335, 6336.  WellPoint sought (1) a coercive sanction against the plaintiffs and (2) a compensatory sanction for attorney's fees.  The District Court held a hearing to determine the appropriate sanctions on March 16, 2012.  MDL 1334 D.E. 6322, 6324.  On July 25, 2012, the District Court entered a final Order of Contempt and Sanctions, in which it ordered the physician Appellants to pay $100

13

and the association Appellants to pay $500 for every month they continued to violate the order.  MDL 1334 D.E. 6340.  The court declined to rule on compensatory sanctions, but noted that it was granting the motion in part and denying it in part.

### E.  Present Appeal and Jurisdiction

On July 26, 2012, Appellants filed this appeal, seeking review of the July 25, 2012 Order issuing sanctions against Appellants.  Appellants challenge the validity of the District Court's July 25, 2012 Order, arguing that the District Court, in its March 8, 2011 Order, erred in finding that Appellants violated the Injunction.  Thus, we must presently consider both Orders.  Appellant Br. at 14-15.

After the filing of the Notice of Appeal, on November 5, 2012, the UCR MDL plaintiffs filed their Fourth Consolidated Amended Complaint.[5]  UCR MDL D.E. 373.  The UCR MDL docket is unclear on which is the operative complaint.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291, which grants us "jurisdiction of appeals from all final decisions of the district courts."  The District Court's July 25, 2012 Order constitutes a final order because it disposed of all

---

[5] On September 5, 2012, the UCR MDL court, the Central District of California, issued an Order granting in part and denying in part WellPoint and Ingenix's Motions to Dismiss, and dismissed the RICO and antitrust claims with prejudice.  UCR MDL D.E. 365.  Appellants nevertheless ask this Court to review the Southern District of Florida's ruling that the Settlement Agreement released those claims in order to preserve their Ninth Circuit appellate rights as to the Central District of California's dismissal.  Appellant Br. at 28 n.9.  In their Fourth Consolidated Amended Complaint, Appellants reassert causes of action under federal antitrust and conspiracy law.  UCR MDL D.E. 373.

issues before it.  See MDL 1334 D.E. 6340; Thomas v. Blue Cross & Blue Shield Ass'n, 594 F.3d 814, 819 (11th Cir. 2010) ("In postjudgment proceedings, a postjudgment order is final for purposes of section 1291 if it 'finally settles the matter in litigation' by disposing of all issues raised in the motion.'" (quoting Delaney's, Inc. v. Ill. Union Ins. Co., 894 F.2d 1300, 1305 (11th Cir. 1990)).

### III.    THE PARTIES' CONTENTIONS

#### A. Appellants' Contentions

Plaintiffs-Appellants argue that the District Court erred by finding them in violation of the Injunction and requiring them to dismiss their claims in the UCR MDL, and thus also erred by holding them in contempt and sanctioning them. Appellants argue that the District Court Orders constituted legal error since the claims asserted in the UCR MDL do not constitute Released Claims.  Appellants first contend that a Released Claim must not only arise from the facts at issue and settled in MDL 1334, but must also have arisen prior to the Effective Date of the Settlement Agreement.  Id. at 21.  Appellants tacitly concede that the allegations in the UCR MDL relate to those of MDL 1334, but they contend that the asserted claims could not have been brought as part of MDL 1334 and, therefore, did not arise prior to the Effective Date of the Settlement Agreement.  Id. at 13.

Appellants focus specifically on their ERISA claims, which they argue accrue only once each of the following steps is complete:  (1) a provider treats a

15

WellPoint plan member, (2) WellPoint plan members or their provider submits an application of benefits to WellPoint, (3) WellPoint fails to make appropriate payment, and (4) the member or provider exhausts available administrative remedies. Id. at 24-25. The UCR MDL Second Consolidated Amended Complaint alleges some instances where each of these elements took place after the Effective Date. Id. at 26. Appellants argue that they could not have asserted those ERISA claims prior to the Effective Date and, thus, those claims do not constitute Released Claims. Id.

Moreover, Appellants contend that the District Court's interpretation of the Settlement Agreement would result in an agreement that releases future claims, in contravention of public policy. Id. at 14. Appellants argue that Judge Moreno's interpretation would bar, in perpetuity, any physician from putting forth any claim regarding WellPoint's use of Ingenix to make benefit determinations. Id. at 16.

### B. WellPoint's Contentions

WellPoint asks this Court to affirm the District Court's Orders because the Settlement Agreement barred the UCR MDL plaintiffs from pursuing their claims, which arose out of similar allegations made in MDL 1334. Appellee Br. at 4. Appellees argue that the Magistrate Judge correctly identified the claims at issue in the UCR MDL as Released Claims under the terms of the Settlement Agreement,

and that the District Court acted within its discretion by adopting the R&R.  Id. at 16-17.

WellPoint contends that Appellants do not dispute that their claims in the UCR MDL "aris[e] out of, or in any way relate[ ] to" the matters at issue in MDL 1334, but rather that they merely argue that their claims did not arise prior to the Effective Date.  Id. at 27.  In response, WellPoint argues that the Magistrate Judge correctly observed that Appellants' arguments "are premised on a conspiracy and course of conduct that allegedly began in 1998, years before the Effective Date." D.E. 6132 (Resp. to Objs. to R&R) at 9-10.  WellPoint further argues that Appellants' attempt to read into the contract a requirement that a cause of action must have accrued prior to the Effective Date must fail because the argument lacks any basis in the contractual language.  Rather, according to WellPoint the Settlement Agreement includes very broad release language, including an expansive definition of "claim" and language expressly releasing "unknown," "unsuspected," and "contingent" claims – in fact, Appellants released all claims "of whatever kind or character –  "whether or not concealed or hidden."  Appellee Br. at 34 (quoting Settlement Agreement § 13.5).[6]

---

[6] WellPoint argues against the import of cases relied on by Appellants to show when claims accrue because those cases discuss accrual in the statute of limitations context, not in an effort to interpret contractual language.  The Supreme Court recently made clear the distinction between the accrual of an ERISA cause of action and the applicable statute of limitations.

17

Despite Appellants' efforts to distance their ERISA claims from their conspiracy allegations, WellPoint argues that those claims arise from the same alleged course of conduct that underlies all other allegations in both MDLs:  that WellPoint improperly used the Ingenix database to price claims for out-of-network service.  Id. at 45.

## IV.    ANALYSIS

### A. Standard of Review

The propriety of the District Court's contempt order turns on whether it properly interpreted the Settlement Agreement.[7]  The law is clear that "[p]rinciples governing general contract law apply to interpret settlement agreements."  In re Chira, 567 F.3d 1307, 1311 (11th Cir. 2009) (interpreting settlement agreement under Florida law) (quoting Resnick v. Uccello Immobilien GMBH, Inc., 227 F.3d 1347, 1350 (11th Cir. 2000)).  District Courts must construe contracts to give effect to the parties' intentions.  Accord Solymar Investments, Ltd. v. Banco Santander S.A., 672 F.3d 981, 991 (11th Cir. 2012) (citing Commerce Nat'l Bank v. Safeco Ins. Co., 252 So. 2d 248, 252 (Fla. 4th DCA 1971)).  This court reviews

---

Heimeshoff v. Hartford Life & Accident Ins. Co., 134 S. Ct. 604, 610 (2013) ("At the same time, we have recognize that statutes of limitation do not inexorably commence upon accrual.").

[7] The parties agreed that the Settlement Agreement "and all agreements, exhibits, and documents relating to [the] Agreement shall be construed under the laws of the State of Florida, excluding its choice of law rules."  Settlement Agreement § 25.

a district court's interpretation of contract provisions de novo.  Ohio Cas. Ins. Co. v. Holcim (US), Inc., 548 F.3d 1352, 1356 (11th Cir. 2008).

This Court reviews a district court's civil contempt order for abuse of discretion.  Riccard v. Prudential Ins. Co., 307 F.3d 1277, 1296 (11th Cir. 2002). "[W]hen employing an abuse-of-discretion standard, we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard."  United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004; see also Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1096 (11th Cir. 2004) ("A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous." (quoting Martin v. Automobili Lamborghini Exclusive, Inc., 307 F.3d 1332, 1336 (11th Cir. 2002)).

A district court's contempt determination must be "supported by clear and convincing evidence."  Riccard, 307 F.3d at 1296.  If the evidence is such that a reasonable person could find a clear and convincing violation of the Injunction, this Court must affirm the contempt ruling of a district court.  Howard Johnson Co. v. Khimani, 892 F.2d 1512, 1516 (11th Cir. 1990).

### B. The All Writs Act

Federal courts have long recognized a court's power to effectuate its orders. The All Writs Act, 28 U.S.C. § 1651(a), provides that "[t]he Supreme Court and all

19

courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  A federal court thus retains the power "to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained."  United States v. New York Tel. Co., 434 U.S. 159, 172, 98 S. Ct. 364, 372, 54 L.Ed.2d 376 (1977); see also Henson v. Ciba–Geigy Corp., 261 F.3d 1065, 1068 (11th Cir. 2001) ("[A] district court has the authority . . . to enjoin a party to litigation before it from prosecuting an action in contravention of a settlement agreement over which the district court has retained jurisdiction."); Wesch v. Folsom, 6 F.3d 1465, 1470 (11th Cir. 1993) (noting that the All Writs Act, 28 U.S.C. § 1651, "empowers federal courts to issue injunctions to protect or effectuate their judgments").

Federal courts may invoke the authority conferred by the All Writs Act to enjoin parties from prosecuting separate litigation to protect the integrity of a judgment entered in a class action and to avoid relitigation of issues resolved by a class action.  See, e.g., United States v. New York Tel. Co., 434 U.S. at 172 ("This Court has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained."); Klay, 376 F.3d at 1104 ("We have

20

ruled, for example, that a district court may issue an injunction under the All Writs Act to prevent prosecution of a state court action that had already been settled under the terms of a federal settlement agreement."); Wesch, 6 F.3d at 1470 ("The district court here based its injunction on the long recognized power of courts of equity to effectuate their decrees by injunctions or writs of assistance and thereby avoid relitigation of questions once settled between the same parties."); VMS Ltd. P'ship Sec. Litig. v. Prudential Sec. Inc., 103 F.3d 1317, 1324 (7th Cir. 1996), overruled on other grounds by Envision Healthcare, Inc. v. PreferredOne Ins. Co., 604 F.3d 983 (7th Cir. 2010) ("Other circuits have similarly approved a district court's use of the All Writs Act to prevent litigants from frustrating or circumventing its orders."); White v. Nat'l Football League, 41 F.3d 402, 409 (8th Cir. 1994) ("While the All Writs Act is not an independent grant of jurisdiction, the ability to facilitate the present settlement by enjoining related suits of absent class members in ancillary to jurisdiction over the class action itself."); In re Y & A Grp. Sec. Litig., 38 F.3d 380, 382-83 (8th Cir. 1994) ("The All Writs Act makes plain that each federal court is the sole arbiter of how to protect its own judgments . . . It is this concept that underlies the related rule that the court which issues an injunction is the only one with authority to enforce it."); see also Henson, 261 F.3d at 1068 ("[A] district court has the authority under the Act to enjoin a party to

21

litigation from prosecuting an action in contravention of a settlement agreement over which the district court has retained jurisdiction.").

### C. Civil Contempt Jurisprudence

We review "a district court's interpretation of its own orders only for an abuse of discretion," a standard that "carries over to the interpretation of injunctions." Alley v. U.S. Dep't of Health and Human Servs., 590 F.3d 1195, 1201 (11th Cir. 2009).

"Great deference is due the interpretation placed on the terms of an injunctive order by the court who issued and must enforce it." Ala. Nursing Home Ass'n v. Harris, 617 F.2d 385, 388 (5th Cir. 1980);[8] Alley v. U.S. Dep't of Health and Human Servs., 590 F.3d 1195, 1202 (11th Cir. 2009) ("The district court is in the best position to interpret its own orders." (internal quotation marks omitted)); Cave v. Singletary, 84 F.3d 1350, 1354 (11th Cir. 1996) ("The district court's interpretation of its own order is properly accorded deference on appeal when its interpretation is reasonable.").

Notwithstanding the deference afforded to the District Court's interpretation of its own orders, the law is clear that "[i]nvalidity of the underlying order is . . . a defense to a civil contempt citation." In re Novak, 932 F.2d 1397, 1401 n.6 (11th

---

[8] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. Id. at 1209.

22

Cir. 1991); see also United States v. United Mine Workers of Am., 330 U.S. 258, 295, 67 S. Ct. 677, 696, 91 L. Ed. 884 (1947) ("The right to remedial relief falls with an injunction which events prove was erroneously issued.").   Thus, the application of an incorrect legal standard taints the District Court's findings in support of a contempt order.  See Holton v. City of Thomasville Sch. Dist., 425 F.3d 1325, 1355 (11th Cir. 2005).

### D. Interpretation of the Settlement Agreement

For many reasons, the district court's interpretation of its own injunction and decision to hold parties in contempt for violating that injunction should be upheld unless a district court a makes a clear error of law in contract interpretation.

The District Court is best equipped to assess the parties' intentions in entering a settlement agreement and, therefore, to construe its terms, particularly in a complicated litigation such as MDL 1334.  See Weyher/Livsey Constructors, Inc. v. Int'l Chem. Co., 864 F.2d 130, 131 n.1 (11th Cir. 1989) (noting that "matter[s] of interpretation" are "best left to the district court").

MDL 1334 is a highly complex multidistrict litigation, first assigned to the Southern District of Florida in April 2000.  The allegations involve a wide-ranging conspiracy by many participants, affecting a large number of plaintiffs.  The parties took more than five years to reach the Settlement Agreement and moved for its preliminary approval on July 11, 2005.  MDL 1334 D.E. 4321.  The District

Court issued its Amended Order approving that Settlement Agreement on January 3, 2006, MDL 1334 D.E. 4684, after months of hearings and briefing. Judge Moreno issued his Order imposing sanctions on Appellants in July 2012, over twelve years after the case first came before the Southern District of Florida. That Order appears on the docket as entry number 6,340.

In Thomas v. Blue Cross & Blue Shield Ass'n, 594 F.3d 814, 817 (11th Cir. 2010), this Court considered release language similar to that of the present Settlement Agreement. There, we set forth the framework for determining whether the release language in a settlement agreement bars claims:

> Under the settlement agreement entered in the class action, the relevant inquiry for determining whether a claim is released is not whether the acts giving rise to the complaint occurred after the class action was filed or the settlement agreement was entered, but whether they occurred after the effective date of the settlement agreement.

Id. at 822. Thus, if "the acts giving rise to the complaint occurred . . . after the effective date of the settlement agreement," the agreement would not release them; whereas, if they arose prior to the effective date of the agreement, they would be barred.

In his R&R, the Magistrate Judge applied this framework and concluded that "all of the Physician Plaintiffs' claims arose 'from acts that occurred before the effective date' of the WellPoint Settlement" and were therefore barred by the

24

"broad and sweeping" release language.  MDL 1334 D.E. 6116 (R&R) at 16, 20-21.

Appellants do not contend that the Magistrate Judge applied an incorrect legal standard.  Nor do they cite any legal authority to suggest that the Magistrate Judge adopted the incorrect legal framework when interpreting the Settlement Agreement.  In fact, the cases that they cite in their opening brief endorse the same relevant inquiry set forth by the Magistrate Judge – that is, that the "relevant inquiry for determining whether a claim is released is . . . whether the acts giving rise to the [new] complaint . . . occurred after the effective date of the settlement agreement."  Appellant Br. at 30 (quoting Thomas v. Blue Cross & Blue Shield Ass'n, 594 F.3d at 817 (alterations in original).[9]

Appellants have failed to show that the District Court abused its discretion in barring the Appellants from pursuing their RICO and antitrust claims in the UCR MDL and holding them in contempt when they refused to withdraw those claims.  Appellants, however, have demonstrated that the District Court erred in enjoining

---

[9] Appellants also rely on Klay v. All Defs., 309 F. App'x 294 (11th Cir. 2009) and Madison Square Garden, L.P. v. National Hockey League, No. 07 CV 8455(LAP), 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008).  These cases, along with Thomas, agree upon the appropriate analysis when determining whether a release provision in a settlement agreement releases claims in a subsequent action.  The District Court must determine whether the legal basis of the claim relies on events that predated the effective date of the agreement.  See Klay, 309 F. App'x at 295 (noting magistrate judge's conclusion that plaintiffs were "forced to concede that their claims predate[d] the Effective Date of the settlement"); Madison Square Garden, L.P., 2008 WL 4547518, at *6 (finding antitrust claim barred by release because it existed "at the time of the release" and "contain[ed] no allegations of post-2005 conduct").

the ERISA claims to the extent that they stem from the denial or underpayment of benefits post-dating the Effective Date, and therefore the Injunction should be vacated to the extent that it bars these claims.

## A. RICO and Antitrust Allegations

With respect to the RICO and antitrust claims, Appellants' argument falls far short.  In reasoning adopted by the District Court, the Magistrate Judge observed that the Appellants "d[id] not dispute that they were aware well before entering into the Settlement Agreement about WellPoint's utilization of the Ingenix Database in order to allegedly engage in their industry-wide conspiracy to underpay providers."  R&R at 11.  The Magistrate Judge continued:  "[T]aken as a whole, the allegations listed in the Complaint clearly relate to the alleged conspiracy of WellPoint and other managed care institutions to underpay providers for their services."  Id. at 13.[10]  Magistrate Judge Torres noted, and the District Court agreed, that Plaintiffs had the option of seeking to enforce the Settlement Agreement if WellPoint had not complied with it, but stated that Appellants could not "get another bite at a very devoured apple if they are not happy with consideration they received in exchange for their broad release."  Id. at 13.

---

[10] In comparison, consider our opinion in Doctors Health, Inc. v. Aetna, 605 F.3d 1146 (11th Cir. 2010).  There, Appellants appealed the district court's determination that their breach of contract claim had been released in a settlement agreement from an earlier class action.  We vacated that determination, holding that the release did not bar Appellants' breach of contract claim where that claim "share[d] no factual basis" with the complaint in the earlier class action.  Id. at 1151.

26

In adopting the R&R, the District Court properly determined that the Settlement Agreement released the Appellants' RICO and antitrust claims in the UCR MDL.  First, the record fully supports the District Court's finding that Appellants' RICO and antitrust claims arose out of the claims at issue in MDL 1334.  The RICO and antitrust claims in the UCR MDL echo the earlier allegations in MDL 1334 – that WellPoint engaged in a scheme to underpay healthcare providers for claims through the use of the Ingenix database.  The Second Consolidated Amended Complaint makes clear that the conspiracy enterprise "was formed in 1998" and that the antitrust conduct also began "at least as early as January 1, 1998."  UCR MDL D.E. 113-1 (Second Consol. Am. Compl.) ¶¶ 288, 369.  Second, the factual record clearly demonstrates that these claims could have been asserted at the time of the Effective Date, since all facts necessary to state a cause of action had occurred long before the Settlement Agreement took effect.  The fact that Appellants seek to base the new claims on certain conduct post-dating the Effective Date does not change this conclusion.  Because they merely constitute a continuation of the conspiracy alleged in MDL 1334, WellPoint's purported bad acts are best seen as new, overt acts within an ongoing conspiracy, rather than new claims in and of themselves.

Moreover, Appellants' decision to release claims stemming from the conspiracy alleged in MDL 1334 in no way interfered with their ability to obtain

relief from ongoing violations of the Settlement Agreement.  Through its Approval Order, the district court retained jurisdiction over "all matters relating to (a) the interpretation, administration, and consummation of the Settlement Agreement and (b) the enforcement of the injunctions described[.]"  Approval Order ¶ 27. Although Appellants were barred from asserting new claims premised on violations of the Settlement Agreement, they could have sought relief from such violations through the procedure to which they consented: namely, through a motion in the district court to enforce the Settlement Agreement and Approval Order.

These claims thus arose "on or before the effective date," "could have been asserted" against WellPoint, and "ar[o]s[e] out of, or [were] in any way related to any of the . . . facts, acts, events, transactions, occurrences, courses of conduct, representations, omissions, circumstances, or other matters referenced" in MDL 1334.[11]  Settlement Agreement § 13.1(a).  The RICO and antitrust claims therefore constitute Released Claims under § 13.1 of the Agreement.  Because the Settlement Agreement released these claims, the District Court did not abuse its discretion by ordering Appellants to withdraw them and holding Appellants in contempt when they refused to comply with that order.

---

[11] Appellants argue that plaintiffs can assert continuing violations of RICO, however, the claims clearly arose before the Effective Date and could have been asserted against WellPoint at that time.

28

**B. ERISA Allegations**

The district court did, however, incorrectly interpret the Settlement

Agreement and thereby abused its discretion with respect to certain of the ERISA

claims. ERISA claims "could [not] have been asserted" on or before the Effective

Date to the extent that they were based on denials or underpayments following the

Effective Date.

WellPoint contends that the ERISA claims "arise from the exact same

alleged course of conduct that underlies the entire UCR MDL Complaint" in that

the claims are based entirely on an alleged scheme that WellPoint improperly used

the Ingenix database to price claims for out-of-network services.  Appellee Br. at

45.

The Magistrate Judge agreed with WellPoint.  The R&R states:

> Plaintiffs enjoy the broad and sweeping nature of the Settlement
> Agreement's release.  Plaintiffs' ERISA and contractual claims
> asserted in the UCR [MDL] all pertain to WellPoint's practices
> regarding the fee-for-service claims and the calculation of the UCRs.
> The very same practice and WellPoint's alleged improper use of the
> Ingenix database were expressly addressed in the [MDL 1334]
> Complaints.

MDL D.E. (R&R) 6116 at 16.  There is no dispute that a claim could have arisen

before the Effective Date if facts forming the basis of the claim existed prior to the

Effective Date.  We assume, without deciding, that the District Court correctly

concluded that the ERISA claims arise out of the "facts, acts, events, transactions,

occurrences, courses of conduct, representations, omissions, circumstances or other matters" at issue in MDL 1334.

However, the District Court's conclusion – that "all of Physician Plaintiffs' claims arose 'from acts that occurred before the effective date' of the WellPoint Settlement and are, similarly, barred" – does not follow. Id. at 21. That conclusion does not complete the analysis because Appellants contend, in part, that even if the necessary factual basis upon which Appellants could assert their ERISA claims did exist at the time of the Effective Date, the claims nevertheless could not have been asserted at that time. Put another way, if the ability to "assert" an ERISA cause of action for denial of these benefits only occurred after the Effective Date of the Settlement Agreement, then § 13.1(a) would not bar such a claim.

Our resolution of this issue hinges in large part on at what point an ERISA claim can be asserted.[12] A similar issue arose in Paris v. Profit Sharing Plan for Emp. of Howard B. Wolf, 637 F.2d 357, 361 (5th Cir. Feb. 17, 1981). In Paris, we considered whether we had jurisdiction – there, whether the claim arose under federal jurisdiction – to review a district court's determination that appellants were not entitled to certain benefits under ERISA. The jurisdictional question turned on

---

[12] Dictionaries offer a broad definition of the word "assert" and provide no guidance as to whether "assert" in the Settlement Agreement requires the filing of a lawsuit. See, e.g., Black's Law Dictionary 124 (8th ed. 2004) ("1. To state positively. 2. To invoke or enforce a legal right."); Oxford English Dictionary Online, http://english.oxforddictionaries.com (last visited Mar. 18, 2014) (defining assert as to "state a fact or belief confidently and forcefully").

whether the claim arose before the date on which ERISA took effect:  January 1, 1975.  Id. at 359.  If the claim arose on the date of the claimant's termination, it would predate the Effective Date of ERISA.  If it arose upon the denial of benefits, it would post-date the Effective Date, and thus arise under federal law.  We held that we did have jurisdiction, observing that "for purposes of ERISA a cause of action does not accrue until an application [for benefits] is denied."  Id. at 361.  This holding was followed by this Court in Gulf Life Ins. Co. v. Arnold, 809 F.2d 1520, 1525 (11th Cir. 1987).  Accordingly, an ERISA lawsuit cannot be filed in federal court until a claim is denied.

In keeping with this conclusion, Appellants' ERISA claims based on the denial or underpayment of benefits following the Effective Date cannot meet the "could have been asserted" prong of § 13.1 of the Settlement Agreement because, absent a denial or underpayment on or before the Effective Date, such claims would not have accrued.  Appellants set forth a number of allegations that meet these criteria.  For instance, the Second Consolidated Amended Complaint alleges that, following the Effective Date, Dr. Schwendig provided emergency medical services to patients participating in a plan that WellPoint administered.  UCR MDL D.E. 113-1 (Second Consol. Am. Compl.) ¶¶ 224.  Dr. Schwendig was allegedly underpaid, appealed the purported underpayments, and was unable to recoup the amount owed to him.  Id. at ¶ 228.  Likewise, in November and December of 2007,

31

Dr. Kavali purportedly provided medical services, was underpaid for those services, and was given no apparent mechanism for appealing the underpayment. Id. at ¶¶ 254-56, 259. Because ERISA claims stemming from the denial or underpayment of benefits following the Effective Date "could [not] have been asserted" on the Effective Date, the District Court erred in enjoining the Appellants from pursuing such claims.

WellPoint argues that another section of the Settlement Agreement, titled Covenant Not to Sue, supports its interpretation and the District Court's Contempt Order. We disagree. Section 13.2(a) states that the releasing parties will not participate in litigation "based upon or related to any Released Claim." In effect, WellPoint argues that any underpayment must be related to this settlement simply by virtue of being an underpayment. But the inclusion of an Effective Date into the Settlement Agreement clearly contrasts the idea of barring all claims against WellPoint in perpetuity. The Covenant Not to Sue section does not apply to claims that could not have been asserted prior to the Effective Date and, therefore, does not bar such claims.

We note briefly that, even though § 13.5 broadens the scope of the release, it does not go so far as to release claims where the full factual basis required to legally state a cause of action, such that the cause of action "could have been asserted," did not exist as of the Effective Date. In § 13.5, Appellants agreed to

32

"fully, finally and forever" release "any known or unknown, suspected or unsuspected, contingent or non contingent claim with respect to the subject matter of the provisions of § 13, whether or not concealed or hidden, without regard to the discovery or existence of such different or additional facts."  Settlement Agreement § 13.5.  This section broadly releases any claim that could have been brought, at the time of the Effective Date, based on the existence of facts – whether they be known or unknown – as of the Effective Date.  The language of this section does not, however, go so far as to release claims based on facts occurring after the Effective Date.[13]

Furthermore, the Settlement Agreement does release post-Effective Date claims in certain narrow instances.  In §13.1(b), which addresses claims against BCBSA, the release language makes clear that the parties agreed to "forever abandon and discharge any and all Claims that exist now or that might arise in the future" where such claims "are based on conduct by any of the Released Parties that occurred on or before the Effective Date and are, or could have been asserted by any Releasing Party . . . ."  Settlement Agreement § 13.1(b).  If the parties had

---

[13] Undoubtedly, certain facts existed that could have given rise to some ERISA claims, even if not the ones presently at issue, and Appellants had knowledge of those facts.  For example, the Second Consolidated Amended Complaint alleges that WellPoint underpaid for benefits for many years prior to the Effective Date of the Settlement Agreement.  Denial of proper payment for those benefits may have constituted an ERISA claim that could have been asserted prior to the Effective Date.  Appellants should have explicitly excluded such ERISA claims in the release, but did not do so.  This, however, has no bearing on ERISA claims based on underpayment for procedures performed after the Effective Date.

intended the scope of § 13.1(a) to mirror that of 13.1(b), which expressly releases claims that could arise after the Effective Date – although based on conduct that existed prior to the effective date – the parties would have used such language in § 13.1(a).  Accordingly, at least some of Appellants' ERISA claims "could [not] have been asserted" on the Effective Date.  The Settlement Agreement does not release them, and the Injunction must be vacated as to such claims.

We note that Judge Martin dissents from our opinion, in part, based on her conclusion that the Settlement Agreement does not bar the RICO and antitrust claims.  We agree with Judge Martin that the Settlement Agreement "did not protect WellPoint for any misconduct for all time."  The crux of our disagreement, however, is that Judge Martin believes that the allegations in the UCR MDL indicate "new, wrongful conduct" whereas we view the conduct as being a continuation of the same conduct raised in MDL 1334.

The cases cited by Judge Martin do not persuade us otherwise.  For example, Judge Martin distinguishes *Madison Square Garden, L.P. v. National Hockey League*, 2008 WL 4547518.  There, the court observed that the plaintiff's allegations were not based on conduct that post-dated the release, but were instead based on a continuation of pre-existing policies.  *Id.* at *6.  The court thus had "little trouble" concluding that the antitrust claims existed at the time of the release and that the parties intended the release to bar those claims.  *Id.*  We view the UCR

34

MDL allegations similarly, and conclude that the claims based on those allegations "could have been asserted," and were in fact asserted, prior to the Effective Date.

We once again note that Appellants were not without recourse if WellPoint acted in violation of the Settlement Agreement after the Effective Date. Rather, they could have filed a motion in the district court to enforce the Settlement Agreement and the corresponding Approval Order. Their failure to do so does not warrant a departure from the parties' intentions to bar claims that arose out of the conduct at issue in MDL 1334 and that could have been asserted as of the Effective Date.

In sum, because Appellants' ERISA claims that are premised on the denial or underpayment of benefits subsequent to the Effective Date do not fall within the "could have been asserted" prong of the Settlement Agreement, the Settlement Agreement does not release such claims. Thus, we vacate the District Court's judgment barring Appellants' ERISA claims to the extent that they arise out of post-Effective Date underpayments or denials of benefits.

## V.    SANCTIONS

A district court has "broad discretion in fashioning civil contempt sanctions," Howard Johnson Co. v. Khimani, 892 F.2d 1512, 1519 (11th Cir. 1990), and this court "review[s] the district court's assessment of contempt sanctions for an abuse of discretion," McGregor v. Chierico, 206 F.3d 1378, 1388

35

(11th Cir. 2000). Appellants do not challenge the method by which the District Court assessed sanctions, but rather limit their challenge to the validity of the underlying Order barring Appellants from proceeding with their claims. On remand, the District Court will be tasked with determining which of Appellants' ERISA claims are based on the denial or underpayment of benefits following the Settlement Agreement's Effective Date. The District Court will also need to reconsider its assessment of sanctions in light of this opinion. Thus, we will vacate the sanctions and remand to the District Court.

## VI.    CONCLUSION

For the foregoing reasons, the judgment of the District Court is affirmed in part, vacated in part, and remanded. We affirm the Injunction as to Appellants' RICO and antitrust claims and as to ERISA claims based on the denial or underpayment of benefits on or before the Settlement Agreement's Effective Date, but vacate the Injunction as to ERISA claims based on the denial or underpayment of benefits following the Settlement Agreement's Effective Date. On remand, the District Court will need to determine which of Appellants' ERISA claims fall on the permissible side of the line, and reconsider the assessment of sanctions.

**AFFIRMED IN PART; VACATED IN PART; REMANDED.**

MARTIN, Circuit Judge, concurring in part and dissenting in part:

I agree with my colleagues that, based on WellPoint's actions after the Effective Date of the Settlement Agreement in the earlier class action regarding WellPoint's reimbursement of claims, the District Court abused its discretion in concluding that certain ERISA claims in the later-filed cases were Released Claims.[1]  But based on the language of that Settlement Agreement, I would reach this same result for the RICO and antitrust claims the Physicians seek to bring here as well.  Like the ERISA claims, the RICO and antitrust claims also depend on WellPoint's actions taken after the Effective Date.  Therefore, the ruling I seek— that the ERISA, RICO, and antitrust claims based on WellPoint's actions taken after the Effective Date of the Settlement Agreement were not released by that Agreement—would treat all of these claims the same.  In contrast, the Majority's Opinion reaches different results for various claims made based on identical post-Effective Date actions taken by WellPoint and vacates the injunction only as to certain ERISA claims.  I would lift the Injunction as to the RICO and antitrust claims as well, so I dissent from the Majority Opinion in that respect.

## I.  BACKGROUND

---

[1] I will use the terms the Majority did, including UCR MDL (referring to the lawsuit filed in 2009 challenging the post-Settlement Agreement's usual, customary, and reasonable rates of reimbursement, which is the subject of this appeal), MDL 1334 (referring to the case number of the earlier litigation originally filed in 2000, assigned as a Multi-District Litigation case to the District Court in the Southern District of Florida, and settled in 2005), and BCBSA (Blue Cross Blue Shield of America).  Also, when I use the term Physicians, I refer collectively to the doctors and their professional associations that are the Appellants in this case.

In 2005, WellPoint agreed to change a number of its business practices in order to settle MDL 1334.  Among the changes WellPoint agreed to was to change the way it had determined usual, customary, and reasonable rates.  Specifically, the Settlement Agreement stated that WellPoint "agrees that, to the extent it uses Physician charge data to determine the usual, reasonable and customary amount to be paid for services performed by Non-Participating Physicians, it will not use any internal claims database that" systematically underprices the claims.

For their part, the Physicians agreed that as of the Effective Date of the agreement they were giving up certain claims.  The Settlement Agreement defined the Released Claims as:

> any and all causes of action, judgments, liens, indebtedness, costs, damages, obligations, attorneys' fees, losses, claims, liabilities and demands of whatever kind or character (each a "**Claim**"), arising on or before the Effective Date, that are, were or could have been asserted against any of the Released Parties by reason of, arising out of, or in any way related to any of the facts, acts, events, transactions, occurrences, courses of conduct, representations, omissions, circumstances or other matters referenced in the Actions, whether any such Claim was or could have been asserted by any Releasing Party on its own behalf or on behalf of other Persons, or to the business practices that are the subject of § 7.

Settlement Agreement § 13.1(a).  As the Majority recognizes, "the inclusion of an Effective Date into the Settlement Agreement clearly contrasts the idea of barring all claims against WellPoint in perpetuity."  Maj. Op. at 31.

38

After preliminary approval of the settlement by the District Court, a notice of the settlement was mailed to potential class members.  The notice began:  "IF YOU ARE A PHYSICIAN WHO PROVIDED COVERED SERVICES TO ANY INDIVIDUAL ENROLLED IN OR COVERED BY CERTAIN HEALTH CARE PLANS AT ANY TIME BETWEEN AUGUST 4, 1990 AND JULY 15, 2005 . . . PLEASE READ THIS NOTICE CAREFULLY."  The part of the notice that told the class members about the claims which would be released against WellPoint described them as those "arising on or before the date that the Court's order approving the settlement becomes final, that are, were or could have been asserted."  The next sentence added that "claims that exist now or that might arise in the future" are waived against BCBSA.  The notice highlighted that at an upcoming hearing, the District Court "will consider whether to enter orders that would prevent members of the Class and certain other persons, including the Defendants in the Actions other than WellPoint, from asserting certain claims against WellPoint in the future."

The District Court approved the Settlement Agreement for MDL 1344 in an Amended Order filed in January 2006.  That Order permanently enjoined the Physicians who had not opted out of the Settlement Agreement from participating in lawsuits "arising out of or relating in any way to the Released Claims."  Generally tracking the language in the class notice, the amended order approving

39

the settlement noted that claims "that exist now or that might arise in the future against BCBSA" were released, while against WellPoint claims were released "that are, were or could have been asserted against any of the Released Parties by reason of, arising out of, or in any way related to" the facts at issue. The District Court retained jurisdiction on "all matters relating to (a) the interpretation, administration, and consummation of the Settlement Agreement and (b) the enforcement of the injunctions described."

Then in 2009 came the UCR MDL lawsuit alleging antitrust, RICO, ERISA, and state law violations by WellPoint and others in connection with a conspiracy of failing to pay the UCR rates for out-of-network services. The Second Consolidated Amended Complaint in the UCR MDL alleged that "Ingenix serves as a conduit for the conspiracy and is a hidden profit engine of the health insurance business." That Complaint includes allegations, for example, that after the Effective Date of the Settlement Agreement for the MDL 1344 case, WellPoint provided false and misleading certifications to Ingenix, and that Ingenix, knowing that certain answers from WellPoint were false, "continued to accept the data and overlook the falsehoods, nevertheless." Fundamentally, the question presented by this appeal is whether the claims raised by these plaintiffs in the UCR MDL are barred because they are Released Claims under the MDL 1334 Settlement Agreement.

## II.  DISCUSSION

There are two related ways to analyze whether the claims advanced in this lawsuit were released in the earlier one.  The first is to examine the language used in the Settlement Agreement and class notice.  The second is to apply this Court's precedent to the facts of this case.  Both analyses lead to the conclusion that the UCR MDL claims were not released.

### A.  TEXT OF THE SETTLEMENT AGREEMENT AND CLASS NOTICE

I begin with the language of the Settlement Agreement, particularly the definition of Released Claims.  It is not in dispute that if parties to a settlement clearly and unambiguously agree to do so, "[f]uture damages may be released if such is the intent of the parties."  W.J. Perryman & Co. v. Penn Mut. Fire Ins. Co., 324 F.2d 791, 793 (5th Cir. 1963).[2]  However, the language of a settlement agreement determines whether that is so.  "Litigation or settlement will not automatically bar a later suit for a second, identical breach."  Klein v. John Hancock Mut. Life Ins. Co., 683 F.2d 358, 360 (11th Cir. 1982).  There are two ways in which the definition of Released Claims here indicates the intent to limit the release and not include future damages.  They are the definition's time limit of

---

[2] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. Id. at 1209.

"arising on or before the Effective Date," and the statement that the claims released "are, were or could have been asserted."

Because the term "arising" is not defined in the Settlement Agreement, it is necessary to look to the common understanding of the term. For a long time, courts have understood that an action does not arise until a plaintiff has a legal right to sue on it. See, e.g., St. Louis & S.F.R. Co. v. Spiller, 274 U.S. 304, 313, 47 S. Ct. 635, 638 (1927) (finding "that the term 'arise' was used in the decree as the equivalent of 'accrue'"); Fed. Reserve Bank v. Atlanta Trust Co., 91 F.2d 283, 287 (5th Cir. 1937) ("This cause of action did not, it could not, arise until plaintiff had paid the moneys out, and was in a position to demand reimbursement."); see also Levy v. Ohl, 477 F.3d 988, 992 (8th Cir. 2007) (stating that "plaintiff's right to sue arises . . . when the plaintiff could first maintain his cause of action successfully" (quotation omitted)).

Based on this understanding of the word arising, and because the Settlement Agreement defined Released Claims as those "arising on or before the Effective Date," the Physicians released only those claims they could have sued for as of the Effective Date. In contrast, the only claims asserted in the UCR MDL were those that required additional acts to take place after the Effective Date. Critically, the Physicians allege that WellPoint committed new acts after the Effective Date, which caused them to be underpaid for certain services.

42

The import of the definition of Released Claims in the Settlement Agreement is buttressed by its use of the phrase "are, were or could have been asserted." "Are" asserted claims were those asserted at the time of the Settlement Agreement—clearly the claims in the UCR MDL are not among those. "Were" asserted claims would be those that had already been asserted. Again, the UCR MDL claims had not. The question remaining, then, is whether the UCR MDL claims "could have been" brought at the time the parties entered into the Settlement Agreement. Following this analysis, the Majority acknowledges and recognizes that certain claims in the UCR MDL could not have been brought but for the new actions WellPoint took after the Effective Date. Maj. Op. 30–31. I agree. However, the Majority does not extend the logic behind its recognition that the ERISA claims could not have been brought prior to the Effective Date of the Settlement of the MDL 1344 case to the remainder of claims brought by the Physicians in the UCR MDL. To the contrary, the Majority finds that the remaining claims were released by the Settlement Agreement.

WellPoint argues that the Physicians "do not suggest . . . WellPoint began doing something different or new that it had not been doing before." But this argument ignores that WellPoint agreed to quit doing what it had done before. The Physicians entered into the Settlement Agreement, which called for payments by WellPoint and WellPoint's agreement to change the way it made reimbursements

43

so as to avoid future problems. Nothing in the Settlement Agreement suggests that the Physicians gave up their right to take action in the future if WellPoint engaged in new, wrongful conduct that resulted in underpayment for services not yet rendered. So while the Physicians never dispute that WellPoint had underpaid them in the past, they do allege new acts resulting in fresh underpayments. Cf. Manning v. City of Auburn, 953 F.2d 1355, 1360 (11th Cir. 1992) ("[W]e do not believe that the res judicata preclusion of claims that 'could have been brought' in earlier litigation includes claims which arise after the original pleading is filed in the earlier litigation.").

This plain reading of the Settlement Agreement is in keeping with the notice to potential class members. Certainly it is the language of the Settlement Agreement that controls, but the notice underscores that the UCR MDL claims were not released in the MDL 1334. First, the notice, in all capital letters, tells physicians who provided services "between August 4, 1990 and July 15, 2005" to read the notice carefully. As a result, physicians providing services after July 15, 2005 are not given any notice that they are impacted by the settlement. It is only those doctors who provided services between the delineated dates that were clearly informed of the release. Physicians who had not yet provided the relevant services, but might do so in the future, would understandably believe this notice had no relevance to them.

44

Second, the notice states that class members are giving up "all claims that exist now or that might arise in the future" against BCBSA. But the language the parties chose to describe the claims that were released against WellPoint is strikingly different. For WellPoint, the notice says that class members are giving up claims arising on or before the Effective Date. It is true that the details of the settlement, including the treatment of possible future claims, was to be the subject of a hearing before the District Court. Again however, the notice gave no indication that the Settlement Agreement was intended to release future claims against WellPoint by class members for services not yet rendered.

WellPoint argues that if the Settlement Agreement is interpreted to allow for future claims, "companies would not be able to settle class action lawsuits because they could never be assured of 'buying peace' no matter how much they paid." Quite to the contrary, the Settlement Agreement did buy peace for WellPoint for all of its conduct prior to the Effective Date. It just did not protect WellPoint for any misconduct for all time. WellPoint remains "on the hook" for any new bad acts it commits after the Effective Date. And it is only new actions, taking place after the Settlement Agreement, which are at issue in the UCR MDL. See Lawlor v. Nat'l Screen Serv. Corp., 349 U.S. 322, 329, 75 S. Ct. 865, 869 (1955) ("Acceptance of the respondents' novel contention would in effect confer on them a partial immunity from civil liability for future violations.").

45

WellPoint argues that another section of the Settlement Agreement, titled "Covenant Not to Sue," supports their interpretation. Section 13.2(a) states that the releasing parties will not participate in litigation "based upon or related to any Released Claim." While the use of "related to" in § 13.2(a) suggests a broader covenant not to sue than what is in the definition of Released Claims, when read alongside the other Settlement Agreement provisions it is clear the parties intended a cutoff point. WellPoint argues, in effect, that any underpayment must be related to this settlement, simply by virtue of being an underpayment. But the setting of an Effective Date within the Settlement Agreement conflicts with the idea of barring all claims against WellPoint in perpetuity. New actions taken by WellPoint after the Effective Date of the Settlement Agreement, and resulting in underpayments, are not covered by the Covenant Not To Sue. Those claims—ERISA or otherwise—are therefore not released.

Counsel for WellPoint seemed to acknowledge this point at oral argument. He said that if WellPoint began doing something new after the Effective Date, it would be actionable under the Settlement Agreement:

> So let's say we stopped using Ingenix in 2008 and we began using a brand new database that we hadn't used before. Then I think the Plaintiffs could come along and say, "Well, look, we're complaining about something new that you weren't doing before."[3]

---

[3] Oral Argument at 27:52–28:11, Oct. 9, 2013.

But this is a distinction without a meaningful difference. The Settlement Agreement does not mention Ingenix. The gravamen of the Physicians' concern was with being underpaid—by whatever mechanism. The Settlement Agreement was intended to compensate the Physicians for underpayments in the past and change WellPoint's business practices to avoid underpayments in the future. And the Majority acknowledges that WellPoint engaged in "new, overt acts." Maj. Op. at 26. However, the Majority characterizes those acts as being a part of "an ongoing conspiracy." The plain language of the Settlement Agreement provides that claims predicated upon future acts taken by WellPoint to underpay physicians are not released.

### B.  APPLICATION OF CASE LAW TO FACTS

A familiar canon of construction helps clarify that the claims here were not released. The word "future" does not appear in the definition of Released Claims in § 13.1(a) of the Settlement Agreement. And the parties were certainly aware of their ability to negotiate away future claims. That is evidenced by the fact that the parties referred to future claims in § 13.1(b), where the Settlement Agreement discusses claims against BCBSA. To my mind, this distinction demonstrates the parties' choice not to address future claims as to WellPoint. See In re Celotex Corp., 487 F.3d 1320, 1334 (11th Cir. 2007) ("[W]hen certain matters are mentioned in a contract, other similar matters not mentioned were intended to be

47

excluded." (quotation omitted)); see also Maj. Op. at 32–33 ("If the parties had intended the scope of § 13.1(a) to mirror that of 13.1(b), which expressly releases claims that could arise after the Effective Date—although based on conduct that existed prior to the effective date—the parties would have used such language in § 13.1(a).")

WellPoint argues that "federal class action settlements routinely include releases waiving future claims." This is certainly true. However, the cases WellPoint points to in support of this proposition are readily distinguishable, at least because the Settlement Agreement it relies upon does not refer to future claims against WellPoint. For example, WellPoint cites to McClendon v. Georgia Department of Community Health, 261 F.3d 1252 (11th Cir. 2001). The McClendon litigation arose out of a tobacco settlement agreement negotiated by 46 states and a number of tobacco companies. The McClendon plaintiffs were Medicaid recipients who wanted proceeds of the settlement beyond what Georgia paid on medical assistance, but they had not participated in the negotiations of that settlement agreement. The defendants moved to dismiss. In addition to being factually inapposite and arising in a very different procedural posture, then, the language of the release in McClendon refers explicitly to "future conduct" and "future Claims." Id. at 1254. Considering that language, this Court observed that "[a]s the quoted provisions indicate, by entering into the settlement agreement

48

Georgia released its past and future claims." Id. at 1255. The McClendon release clearly reflected the intent of the parties as to future claims, while the agreement before us does not. For many reasons, McClendon's guidance for this case is limited.

WellPoint also points to cases addressing antitrust violations based on conduct that originated at a prior time, arguing that courts "have found that releases do bar antitrust claims when they are based on a continuation of the released conduct." Again—this is certainly true. However, the utility of the cases relied upon by WellPoint to help it here is belied by the facts of those decisions. For example, WellPoint claims the case Madison Square Garden, L.P. v. National Hockey League, 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008), is similar to this case. Instead it is quite different. Madison Square Garden had signed an agreement that "forever releases and discharges" the National Hockey League from any claims related to policies in effect at the time the agreement was executed in 2005. Id. at *5. Notwithstanding this language, Madison Square Garden sued based on "no allegations of post-2005 conduct apart from (1) the enforcement of pre-existing policies and (2) the 2006 extension of the licensing agreement that had been in place since 1994, which reaffirmed each Member Club's assignment of the right to 'use or license its team's trademarks' to the League." Id. at *6. Given the gap between what claims Madison Square Garden released and what claims they

49

subsequently brought, the District Court "ha[d] little trouble" dismissing certain claims. Id. at *7. Quite distinctive from Madison Square Garden, this case involves new post-release conduct. Thus, the holding in Madison Square Garden is of little assistance here.

WellPoint also relies on Klay v. All Defendants, 309 F. App'x 294 (11th Cir. 2009). In Klay, the plaintiffs were "forced to concede that their claims predate the Effective Date of the settlement." Id. at 295 (quoting MDL 1334 Dkt. 5838 (MDL 1334 R&R) at 18). Indeed, a review of the Report & Recommendation in that case makes the distinction between Klay and this case even more clear. In Klay, "Plaintiffs suggest that it is irrelevant whether their claims existed prior to the settlement, so long as they were subjectively unaware of the existence of their claims." (MDL 1334 R&R at 18 (emphasis added)). There is no such concession or suggestion here. Thus, Klay is of little relevance to this case. The same is true of Thomas v. Blue Cross & Blue Shield Ass'n, 594 F.3d 814 (11th Cir. 2010), another case relied upon by WellPoint and cited by the Majority. See id. at 822 ("Kolbusz's claims of tortious interference and defamation arise from acts that occurred before the effective date, which is the only date the district court should have considered.").

WellPoint is correct that this Court and others have encouraged the pretrial settlement of class action lawsuits. See, e.g., In re U.S. Oil & Gas Litig., 967 F.2d

50

489, 493 (11th Cir. 1992).  But I am not aware that this Court has ever encouraged protection for future wrongdoing, particularly where parties have not expressly addressed it in their settlement agreement.  The Settlement Agreement here did not immunize WellPoint for future underpayments to doctors.  For these reasons, I would vacate the Injunction not just for the ERISA claims, but for the RICO and antitrust claims as well.