MARCUS, Circuit Judge:
When the Original Brooklyn Water Bagel Company (“OBWB”) settled a qui tam false marking suit, the district court entered a final judgment that barred future lawsuits against OBWB related to certain *1322 false patent marking or advertising. Thereafter, Bersin Bagel Group, LLC (“Bersin”) sued OBWB in state court for damages tied to Bersin’s investment in an OBWB franchise. OBWB sought, and the district court issued, an order that purported to enforce the federal judgment by enjoining Bersin’s state court suit. Bersin appeals that order, but we lack jurisdiction to hear its challenge. The order was not final under 28 U.S.C. § 1291 because it was not the proper tool for enforcing an injunction: it did not hold a noncompliant party in contempt or impose sanctions. See Thomas v. Blue Cross & Blue Shield Ass’n (Thomas II), 594 F.3d 823, 829-30 (11th Cir.2010). Nor was the district court’s order an appealable interlocutory decision for purposes of § 1292(a)(1). Instead of granting or modifying an injunction, it merely clarified the existing injunction found in the district court’s judgment. See id. at 831-32. Without jurisdiction, we must dismiss this appeal.
I.
Appellee OBWB is a Florida corporation and the parent company of Brooklyn Water Bagel Franchise Co., Inc. (“BWB”), which franchises a quick service restaurant concept featuring the sale of bagels, coffee, bottled water, beverages, and related products. Steven M. Fassberg is OBWB’s and BWB’s CEO and former president. Appellant Bersin is a Florida limited liability company that entered a franchise agreement with BWB in August 2010 for a restaurant on Alton Road in Miami-Dade County, Florida. Bersin alleges in its state court suit that it suffered damages from the deal because of misrepresentations by Fassberg and his companies. However, OBWB believes that Bersin’s claims were released as part of a settlement in a federal qui tarn action involving alleged false patent marking by OBWB.
First came the qui tarn action. On September 17, 2010, Mamma Mia’s Trattoria, Inc. (“Mamma Mia’s”), a Florida corporation that owns and operates an Italian restaurant, sued OBWB in federal district court on behalf of itself and as qui tarn relator representing the United States of America and the general public. Mamma Mia’s cited violations of 35 U.S.C. § 292, which at that time provided, inter alia:
(a) ... Whoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word “patent” or any word or number importing that the same is patented, for the purpose of deceiving the public ... [sjhall be fined not more than $500 for every such offense.
(b) Any person may sue for the penalty, in which event one-half shall go to the person suing and the other to the use of the United States.[1]
35 U.S.C. § 292 (2006).
In its amended complaint, Mamma Mia’s alleged that “OBWB falsely claims to the public and advertises in interstate commerce that it makes, uses and sells bagels and other food products, including bottled water, which are unique and exclusive to any other manufacturer or seller” because the products “derive from a ‘patented 14 stage water treatment process’ or ‘patented 14 stage water treatment system’ that replicates Brooklyn, New York water, al *1323 legedly creating bagels, bottled water, and water for other products identical to those made, used and sold in Brooklyn, New York.” Mamma Mia’s claimed that OBWB made numerous misrepresentations in advertising in connection with its products: on its website, YouTube, and Twitter; on a sign on restaurant equipment; on OBWB’s menus and Menu Board; and in “dozens of press releases and other advertising.” Mamma Mia’s further alleged that “[t]he false claims are knowingly, purposefully and willfully being asserted and condoned by OBWB to support and give credence to OBWB’s claim that it alone has the exclusive capability to make Brooklyn water at locations outside New York,” even though “OBWB neither owns nor holds any patents whatsoever as recognized by the official records of the United States Patent and Trademark Office.”
On March 16, 2011, Mamma Mia’s, with the consent of the United States Department of Justice, entered into a Settlement Agreement with OBWB. On March 28, the district court entered a Final Consent Judgment, finding that Mamma Mia’s had standing to pursue and dispose of the claims on behalf of the United States and the general public pursuant to 35 U.S.C. § 292. In dismissing the action, the district court also
ORDER[ED] and ADJUDGE[D] that any future litigation alleging violations of 35 U.S.C. § 292 or any other statute or law related to false marking or false advertising, with regard to any past or existing product, advertising regarding patented process, water treatment system, technology, water, ice cubes, or “Cubsta machine”, covered by this Stipulation of Dismissal, that has been marked, manufactured, sold, distributed, advertised or promoted by OBWB prior to entry of this Final Judgment, is barred.
A year after the Final Consent Judgment, Bersin sued Fassberg and BWB in Florida circuit court in Miami-Dade County, alleging that Bersin had been' induced into investing more than $350,000 in the Alton Road BWB franchise through fraud and- misrepresentations, some of which concerned OBWB’s advertising of patented technology. Bersin claimed that Fassberg also stated the Alton Road shopping center was a perfect location for a “flagship” restaurant that would gross at least $1,500,000 in annual sales, and that Bersin could sit back and collect a check, with Fassberg handling operations. In its June 19, 2012, second amended complaint, Bersin alleged that Fassberg induced Bersin’s investment in the Alton Road restaurant by conveying “false and misleading information regarding Defendants’ advertising and marketing claims” concerning a “patented 14 stage water treatment process” or “patented technology.” Bersin brought three state law causes of action: (I) fraud in the inducement; (II) negligent misrepresentation and omission; and (III) violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. §§ 501.201-.213.
To stop Bersin’s state suit, OBWB turned to the federal district court that had issued the qui tarn Final Consent Judgment. On March 8, 2013, OBWB filed a motion to enforce that judgment, arguing that Bersin’s claims were barred. On May 22, 2013, the district court entered an Enforcement Order granting that motion. The district court concluded that Bersin was in fact “asserting barred claims” in its state court action because “the main .underlying basis for all of these claims are false marking and advertising, which were released and barred by the Settlement Agreement and Final Consent Judgment.” As a result, the district court order “enjoined” each Bersin state cause *1324 of action — Counts I, II, and III — because they “relate[d] to patents and product advertising.” [2] Bersin appeals, arguing that the district court erred in granting OBWB’s motion because Bersin’s claims were not barred by the Final Consent Judgment, the district court lacked jurisdiction over Bersin’s case, and, in any event, the Anti-Injunction Act prohibited the court from enjoining Bersin’s state court suit.
II.
We are obliged to first address our power to review Bersin’s claims. See, e.g., Holloman v. Mail-Well Corp., 443 F.3d 832, 844 (11th Cir.2006) (“The federal courts of appeals are courts of limited jurisdiction.”); Summit Med. Assocs., P.C. v. Pryor, 180 F.3d 1326, 1334 (11th Cir. 1999) (“As an initial matter, we must address our jurisdiction to review Appellants’ claims.”). OBWB moved to dismiss Bersin’s appeal on the ground that this Court lacks appellate jurisdiction. Bersin responded that we have jurisdiction to review the district court’s decision either as a final order pursuant to 28 U.S.C. § 1291, or as an order modifying and expanding a prior injunction under § 1292(a)(1). We do not agree. In the absence of any discernible basis for exercising appellate jurisdiction, we are compelled to dismiss Bersin’s appeal.
Congress has constrained our appellate jurisdiction to only a few, well-defined types of actions. Thomas II, 594 F.3d at 828 (noting that “our jurisdiction is limited to a narrow class of decisions”). As relevant here, we may hear appeals “from all final decisions of the district courts of the United States.” 28 U.S.C. § 1291; see World Fuel Corp. v. Geithner, 568 F.3d 1345, 1348 (11th Cir.2009). We also may entertain challenges to “[¡Interlocutory orders of the district courts of the United States ... granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions.” 28 U.S.C. § 1292(a)(1); see Birmingham Fire Fighters Ass’n 117 v. Jefferson Cnty., 280 F.3d 1289, 1292 (11th Cir.2002).
We lack appellate jurisdiction to hear this case under either section. As for the requirement of a final district court order, we begin by reiterating what by now is almost hornbook law about the proper method by which permanent injunctions may be enforced against noncom-pliant parties:
[Injunctions] are enforced through the trial court’s civil contempt power. If the plaintiff (the party obtaining the writ) believes that the defendant (the enjoined party) is failing to comply with the decree’s mandate, the plaintiff moves the court to issue an order to show cause why the defendant should not be adjudged in civil contempt and sanctioned. The plaintiffs motion cites the injunctive provision at issue and alleges that the defendant has refused to obey its mandate. If satisfied that the plaintiffs motion states a case of non-compliance, the court orders the defendant to show cause why he should not be held in contempt and schedules a hearing for *1325 that purpose. At the hearing, if the plaintiff proves what he has alleged in his motion for an order to show cause, the court hears from the defendant. At the end of the day, the court determines whether the defendant has complied with the injunctive provision at issue and, if not, the sanction(s) necessary to ensure compliance.
Reynolds v. Roberts, 207 F.3d 1288, 1298 (11th Cir.2000) (citations and footnote omitted); see Faught v. Am. Home Shield Corp., 660 F.3d 1289, 1293 (11th Cir.2011) (per curiam) (“If the prosecution of the Edlesons’ class action in California would interfere with the settlement approved by the district court, then American Home Shield should have moved the district court for an order to show cause why the Edlesons should not be held in contempt for violating the injunction against the prosecution of released claims. American Home Shield should not have moved the district court to enter another injunction, and the district court should not have entered a second injunction to enforce its judgment.” (citation omitted)).
Under § 1291, the district court’s postjudgment Enforcement Order is not final because it did not involve contempt or sanctions. “A final order is one that ‘ends the litigation on the merits and leaves nothing for the court to do but execute its judgment.’ ” Crawford & Co. v. Apfel, 235 F.3d 1298, 1302 (11th Cir.2000) (quoting Huie v. Bowen, 788 F.2d 698, 701 (11th Cir.1986)). Though postjudgment decisions necessarily follow a final judgment, such orders “are themselves subject to the test of finality.” Thomas II, 594 F.3d at 829 (quoting Delaney’s Inc. v. Ill. Union Ins. Co., 894 F.2d 1300, 1304 (11th Cir. 1990)).
An order concerning the enforcement of a permanent injunction is not final unless it holds a party in contempt of court or imposes a sanction for violating the injunction. Id. at 830. In Thomas II, we dismissed an appeal similar to Bersin’s for want of jurisdiction. Our language could not have been clearer:
Although the order did not direct the parties to take any further action, our decisions clearly instruct that permanent injunctions are enforced through the civil contempt power of the court. E.g., Roberts, 207 F.3d at 1298. Allowing the district court an opportunity to enforce the permanent injunction through the usual means of contempt proceedings does not preclude appellate review; it postpones our review until the district court has finally settled the matter in litigation. If we were to exercise our appellate jurisdiction at this early stage, before the district court has had an opportunity to enforce the permanent injunction, “the effect would be to tie the hands of the district court ... and augment our own workload.” Combs, 785 F.2d at 977.
Id. (emphasis added); see Thomas v. Blue Cross & Blue Shield Ass’n (Thomas I), 594 F.3d 814, 819 (11th Cir.2010) (“Although the order ruled that Kolbusz is enjoined from prosecuting his claim of breach of contract, the order did not completely dispose of the issue.... Because the order ‘did not hold [Kolbusz] in contempt or impose any sanction’ for prosecuting a released claim in violation of the injunction, it is not appealable as a final order.” (quoting Major v. Orthopedic Equip. Co., 561 F.2d 1112, 1115 (4th Cir. 1977))); Major, 561 F.2d at 1115 (“The order did no more than find Major had violated the prior injunction and the contract. Although it did not direct anything further to be done, it clearly anticipated that in order to dispose of the matter, OEC would take some further action before the court either to have Major held in *1326 contempt, or to avoid the injunction, or other action, any or all of them. It is therefore not a final order.” (emphasis added)).[3] The Enforcement Order did not settle the matter in this case because it did not rule as to contempt or sanctions. Quite simply, we lack § 1291 jurisdiction. The order was not final.[4]
Similarly, we lack § 1292(a)(1) jurisdiction. That section permits interlocutory review of orders “granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions.” 28 U.S.C. § 1292(a)(1). We have explained that “ § 1292(a)(1) must be construed narrowly so as to limit the availability of interlocutory appeals in cases involving injunctions.” Birmingham Fire Fighters, 280 F.3d at 1293; see Switz. Cheese Ass’n v. E. Horne’s Mkt., Inc., 385 U.S. 23, 24, 87 S.Ct. 193, 17 L.Ed.2d 23 (1966) (“[W]e approach this statute somewhat gingerly lest a floodgate be opened that brings into the exception many pretrial orders.”); United States v. City of Hialech, 140 F.3d 968, 973 (11th Cir.1998) (“Congress did not intend for the injunction exception to open the floodgates to piecemeal appeals.”).
We may review an order that modifies a previously entered injunction, but (and the caveat is critical here) an order clarifying or interpreting an existing injunction is not appealable. See Thomas II, 594 F.3d at 832. “A modification inquiry under section 1292(a)(1) has two facets: a reviewing court must examine whether there was an underlying decree of an injunctive character, and if so, whether the ruling appealed from can fairly be said to have changed the underlying decree in a jurisdietionally significant way.” Sierra Club v. Marsh, 907 F.2d 210, 212 (1st Cir.1990). The first prong is met here because the Final Consent Judgment contained an injunction against “any future litigation alleging violations of 35 U.S.C. § 292 or any other statute or law related to false marking or false advertising” with regard to certain past or existing OBWB products or advertising.[5] Our analysis *1327 then necessarily turns on whether the Enforcement Order amounted to a “modification” or a “clarification” of the previous injunction.
In distinguishing between modifications and clarifications, our case law instructs us to apply a “functional approach, looking not to the form of the district court’s order but to its actual effect.” Birmingham Fire Fighters, 280 F.3d at 1293 (quoting Marsh, 907 F.2d at 213). Thus an order modifies, rather than clarifies, an existing injunction “when it actually changes the legal relationship of the parties.” Id.; see Marsh, 907 F.2d at 213 (“Because the district court did not change the nature or scope of the judicially imposed prohibition, the court did not ‘modify’ the injunction within the meaning of section 1292(a)(1).”). Notably, “[a]n order that interprets an injunction changes the legal relationship of the parties only when it blatantly misinterprets the injunction.” Thomas II, 594 F.3d at 832. That is because our precedent forbids us from “analyzing] the injunction and the order in detail. To plunge into the details would collapse the jurisdictional inquiry into a decision on the merits, thwarting the purpose of § 1292(a)(1) ... [and] letting piecemeal appeals, cloaked in the guise of jurisdictional inquiries, come in through the back door.” Birmingham Fire Fighters, 280 F.3d at 1293. As a result, “our inquiry is circumscribed. We ask not whether the district court’s reading of the consent decree is in error, but whether it is a gross misinterpretation of the decree’s original command.” Id. (emphasis added).
In this Circuit, then, we have refused to recognize an appealable modification unless the second order works an obvious change in the rights of the parties. Thomas II involved a class action brought by physicians who alleged that an insurer had “improperly delayed, denied, and reduced payments.” 594 F.3d at 832. When the parties settled, the district court entered a judgment enjoining suit by class members. Id. at 827. A doctor later sued in state court, alleging that the insurer had “retaliated against him for complaining about the plans’ improper reimbursement practices.” Id. at 832. That doctor then sought an order from the district court declaring that his claims did not fall within the injunction. Id. at 827. When the district court denied *1328 the doctor’s motion, this Court refused to hear the appeal, finding no blatant misinterpretation and thus no modification. Id. at 832. Likewise in Birmingham Fire Fighters, a panel of this Court determined that two readings of a previous consent decree were plausible. Because the district court’s interpretation in the second order was “certainly not so implausible as to amount to a blatant misinterpretation,” it was not an appealable modification. 280 F.3d at 1294.
Other circuit courts have reached similar results, stressing that they will not seek “to uncover subtle rather than blatant misrepresentations,” because to do so would be “too searching for a preliminary jurisdictional inquiry.” Gautreaux v. Chi. Hous. Auth., 178 F.3d 951, 958 (7th Cir. 1999); see, e.g., United States v. Philip Morris USA Inc., 686 F.3d 839, 845 (D.C.Cir.2012) (“The district court’s interpretation of the data-disclosure requirement does not change the terms or force of [the original injunction], and it is certainly not ‘obviously wrong.’ ”); Pimentel & Sons Guitar Makers, Inc. v. Pimentel, 477 F.3d 1151, 1155 (10th Cir.2007) (“[T]he District Court did not change the legal relationship between the parties or impose new obligations on Danette, but instead clarified that under the existing 1989 injunction and Rule 65, she is prohibited from aiding Hector in violating the 1989 injunction.”). On the other hand, courts have recognized modifications when new orders clearly changed the reach of an existing injunction. See, e.g., R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel, 286 F.3d 194, 201 (4th Cir.2002) (finding a modification when orders “extended the scope of the earlier injunctions to cover new circumstances” because “the court had earlier only prohibited the sale of individual artifacts but had never enjoined the sale of the artifacts as a collection”); United States v. Bd. of Sch. Comm’rs of City of Indianapolis, 128 F.3d 507, 509 (7th Cir.1997) (“There is no question that in adding compulsory [rather than optional] busing of kindergarten students to the original injunction, the district judge modified that injunction.... ”).[6]
Turning to our circumscribed inquiry, we conclude that the district court’s Enforcement Order is an interpretation not appealable under § 1292(a)(1). Simply put, the Enforcement Order amounted to a clarification because we cannot say that it patently misinterpreted the language of the original injunction. Initially, the Final Consent Judgment ordered that “any future litigation alleging violations of ... any ... statute or law related to false marking or advertising” tied to certain OBWB activities described therein “is barred.” (emphasis added). Like in Thomas II, this original injunction was “extremely broad.” 594 F.3d at 832. On round two, the district court adopted a reasonable interpretation of this expansive prohibition in concluding that Bersin’s state court causes of *1329 action were barred because they were based on OBWB’s marketing and advertising of a patented water treatment process. Each of the causes of action raised in Bersin’s amended state court complaint rested in substantial measure on allegations that Fassberg made fraudulent advertising claims about OBWB’s “patented 14 stage water treatment process” and “patented technology,” and that “Fassberg’s false and misleading information regarding Defendants’ advertising and marketing claims ... is and was integral to the success of the Alton Road BWB.” In other words, adjudicating each of Bersin’s causes of action required the state court to determine whether OBWB had committed false marking and advertising concerning the same patented technology. The district court thus did not blatantly misinterpret its own initial injunction when it determined that Bersin’s causes of action were “related to false marking or false advertising.”
Nor did the district court commit a glaring misinterpretation by determining that Bersin was a party enjoined by the initial order. The paragraph of the Final Consent Judgment that barred “any future litigation” did not specify who was the object of this ban. Elsewhere in the order, though, the court noted that Mamma Mia’s had “standing to act on behalf of the United States of America and the general public.” It was not a blatant misinterpretation for the district court to conclude that the Final Consent Judgment enjoined Bersin — as a member of the general public — from certain future litigation. In addition, although we apply a functional approach, we find it instructive that the district court explained its own Enforcement Order as a direct application of the existing injunction, not an alteration of its sweep. By concluding that the “Final Consent Judgment ... specifically bar[s] Bersin’s causes of action,” the Enforce[1] ment Order did not change the legal relationship of the parties because it did not alter the nature of the existing equitable relief. See id. at 832 (“The order that denied Robertson’s motion, at most, clarified that Robertson’s complaint in a Florida court was released, but the order did not modify the permanent injunction.”).[7]
In the absence of appellate jurisdiction, we cannot consider merits questions. Nor can we tunnel a backdoor to the merits by straining the modification/clarification analysis, lest we undermine the gatekeeping function (and statutory command) of §§ 1291 and 1292.[8] Without jurisdiction to *1330 entertain this matter, we pass no judgment on whether the district court acted within its broad equitable authority in issuing so sweeping an injunction. We say nothing about the enforceability or indeed about the advisability of the injunction entered by the district court. See Birmingham, Fire Fighters, 280 F.3d at 1294 (“The district court’s interpretation might be reversed if the issue were before us on appeal from a final judgment, but it is not. What we hold, and all that we hold, is that the district court’s interpretation of the key language does not so blatantly misinterpret the decree as to ‘modify’ it and thereby create interlocutory appellate jurisdiction under § 1292(a)(1).”).
We recognize that the peculiar nature of the underlying qui tarn action, with Mamma Mia’s (on behalf of the United States) representing the future litigation interests of Bersin, prevented Bersin from having a traditional opportunity to challenge the original injunction as a party to the suit. Nevertheless, Congress established the false marking qui tarn action that permitted Mamma Mia’s representative suit. Congress also “intended appeals from interlocutory orders to be strictly limited to the unusual situations wherein such appeals are expressly authorized.” St. Louis Shipbuilding & Steel Co. v. Petroleum Barge Co., 249 F.2d 905, 907 (8th Cir. 1957). Moreover, adjudicating the merits of Bersin’s challenge would provide it with no relief. Notably, Bersin does not ask us to overturn the imposition of contempt or sanctions. And even if we found fault with the Enforcement Order, our ruling would not disturb the unappealed underlying injunction. Because Bersin does not challenge a final decision or an interlocutory order that has “a final and irreparable effect on the rights of parties,” we have no power to hear this case. Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949); see id. (“Appeal gives the upper court a power of review, not one of intervention. So long as the matter remains open, unfinished or inconclusive, there may be no intrusion by appeal.”).
We underscore, however, that nothing prevents this Court from hearing a future appeal from an order in this case that imposes sanctions or holds Bersin in contempt. We hold only that at this stage in the proceedings this matter is not fit for our appellate review.
DISMISSED for lack of appellate jurisdiction.

. In 2011, Congress amended the false marking statute so that "[o]nly the United States may sue for the penalty authorized by this subsection,” 35 U.S.C. § 292(a) (2012), except "[a] person who has suffered a competitive injury as a result of a violation of this section may file a civil action in a district court of the United States for recovery of damages adequate to compensate for the injury,” id. § 292(b). See Leahy-Smith America Invents Act, Pub.L. No. 112-29, § 16(b)(l-2), 125 Stat. 284, 329 (2011).

. In its Enforcement Order, the district court ORDER[ED] AND ADJUDGE[D] that the motion to enforce final consent judgment of dismissal with prejudice ... is GRANTED. The causes of action in [Bersin’s state suit] that relate to patents and product advertising, including all the materials and statements made prior to March 28, 2011 are
ENJOINED. This injunction includes each of the three counts in the Bersin Bagels Litigation:
a. Count I — fraud in the inducement;
b. Count II — negligent misrepresentation and omission;
c. Count III — violation of FDUTPA.

.In another case with a similar procedural stance, we reached the merits instead of dismissing for lack of appellate jurisdiction. See Faught, 660 F.3d at 1292-93. "Under the prior precedent rule, we are bound to follow a prior binding precedent ‘unless and until it is overruled by this court en banc or by the Supreme Court.' ” United States v. Vega-Castillo, 540 F.3d 1235, 1236 (11th Cir.2008) (per curiam) (quoting United States v. Brown, 342 F.3d 1245, 1246 (11th Cir.2003)). The jurisdictional holding in Faught is neither binding nor the earliest precedent. First, "we are not bound by a prior decision’s sub silentio treatment of a jurisdictional question.” Okongwu v. Reno, 229 F.3d 1327, 1330 (11th Cir.2000); accord King v. Cessna Aircraft Co., 505 F.3d 1160, 1168 (11th Cir.2007) (“[T]he prior precedent rule does not extend to implicit jurisdictional holdings.”). The parties in Faught did not bring the jurisdictional issue to this Court’s attention, and the opinion did not address the basis for appellate jurisdiction. In addition, Thomas II is the controlling prior precedent because it came down in 2010, before Faught in 2011. We follow Thomas II and dismiss for lack of appellate jurisdiction. See 594 F.3d at 832.

. Our dissenting colleague says that the district court entered a § 1291 final order because the court granted all the relief sought in OBWB’s motion. But our precedent is crystal clear that, because permanent injunctions must be enforced through contempt proceedings, the district court order "did not dispose of the matter” and therefore "lacks the finality required for us to exercise jurisdiction under section 1291.” Id. at 829-30. The dissent does not mention these binding principles, nor reconcile them with its conclusion.

. The district court stated that such litigation "is barred.” Though the court did not specifically label its proscription as an injunction, the functional effect of the order controls. See Mitsubishi Int’l Corp. v. Cardinal Textile Sales, Inc., 14 F.3d 1507, 1515 n. 14 (11th Cir.1994) ("[Tjhis court is not bound to ac *1327 cept a district court's characterization of its own rulings.”); Norcal/Crosetti Foods, Inc. v. United States, 963 F.2d 356, 358 (Fed.Cir. 1992) ("The trial court’s amended judgment does not expressly characterize the relief as injunctive, but its characterization is not controlling. The true nature of the trial court’s order is what matters....”). An injunction "require[s] a party either to do or to refrain from doing some act.” 11A Charles Alan Wright et al., Federal Practice and Procedure § 2941 (2d ed.2013); see Black's Law Dictionary 855 (9th ed.2009) (defining an "injunction” as a "court order commanding or preventing an action”). Here, the Final Consent Judgment contained an injunction because it unambiguously stated: “[t]he Court hereby ORDERS and ADJUDGES that any future litigation alleging violations of 35 U.S.C. § 292 or any other statute or law related to false marking or false advertising, with regard to any past or existing product, advertising regarding patented process, water treatment system, technology, water, ice cubes, or 'Cubsta machine’, covered by this Stipulation of Dismissal, that has been marked, manufactured, sold, distributed, advertised or promoted by OBWB prior to entry of this Final Judgment, is barred.”
We think that the dissent has misapprehended the Final Consent Judgment. The dissent states that "the Final Consent Judgment does not order ... anyone ... to do or not do anything in particular.” But, as we’ve explained, the Final Consent Judgment plainly “ORDER[ED] and ADJUDGE[D]” that certain types of litigation were "barred.” The dissent also says that the only signatories to the settlement agreement were the parties, but the district court judge signed the Final Consent Judgment.

. The dissent applies a more searching standard of review to this jurisdictional question, asking whether the district court's second order in any way altered the scope of the restriction on suits in the Final Consent Judgment. But, as our precedent explains, we can only conclude that a subsequent order modifies an injunction for purposes of § 1292(a)(1) if the district court's reading is so implausible as to be a blatant misinterpretation. See, e.g., Birmingham Fire Fighters, 280 F.3d 1289. The dissent places substantial emphasis on the fact that the settlement between Mamma Mia’s and OBWB came as part of a qui tarn action, while Bersin’s suit does not involve qui tom claims. The dissent, however, does not explain how or why the qui tarn nature of the original litigation would alter the necessarily limited standard of review we have applied in the preliminary jurisdictional analysis. Again, we ask only whether the Enforcement Order so obviously misinterpreted the Final Consent Judgment as to modify the original injunction.

. The dissent points out that the Final Consent Judgment was part of a settlement between Mamma Mia's and OBWB. The district court wrote the original injunction broadly, to encompass more than claims brought by Mamma Mia’s. Other paragraphs in the Final Consent Judgment specifically name Mamma Mia’s or OBWB as the parties subject to the Court’s order. Paragraph 3, however, orders a general bar on litigation, without limiting the scope to Mamma Mia’s or OBWB. Whether or not the dissent would read the scope of the Final Consent Judgment differently, we cannot say that the district court’s interpretation of its own order "is blatantly or obviously wrong.” Id. at 1293.

. Though the dissent says it rests its jurisdictional finding on a change in the scope of the original injunction, as we see it its analysis is a backdoor review of the injunction itself. In effect, the dissent reasons that an injunction covering nonparties, or an injunction barring state actions beyond those arising under the False Claims Act, would have been invalid, and therefore the district court must not have issued it in the first place in the Final Consent Judgment. But, in the context of examining our appellate jurisdiction, our task is not to say whether the original injunction was valid; the question of its enforceability is not before us. Instead, we ask only whether the district court’s reading of the Final Consent Judgment in its subsequent order was "so implausible as to amount to a blatant misinterpreta *1330 tion.” Id. at 1294. The dissent does not dispute that the broad language of the Final Consent Judgment could fairly be read as enjoining Bersin from bringing actions against OBWB related to certain false marking or false advertising. It simply proposes to read the order in another way. But because the district court’s reading was a plausible interpretation, not a modification, we lack § 1292(a)(1) jurisdiction. The dissent may be right in its concern about the scope of the injunction. But in this peculiar procedural circumstance — where the district court has not enforced its injunction through contempt proceedings, and where the original injunction is not on appeal — we cannot consider whether that court properly enjoined Bersin or its state court actions.
The dissent cites cases that took § 1292(a)(1) jurisdiction to review injunctions entered under the All Writs Act, 28 U.S.C. § 1651. As we see it, these cases are inapposite, however, because none involve an order that interpreted a previously entered injunction. We reiterate that the Enforcement Order interpreted an existing injunction; it did not modify an injunction or grant a new one.

. This is importantly different from the Thomas cases, which involved class members bound by an injunction which precluded further litigation of certain claims after a class-wide settlement. Bersin was not bound by the Final Consent Judgment.