**Corey MUSSELMAN, Rick Love, Charles Shane, Plaintiffs-Appellants,**

v.

**BLUE CROSS AND BLUE SHIELD OF ALABAMA, Premera Blue Cross and Blue Shield of Alaska, Anthem Blue Cross and Blue Shield of Connecticut, Blue Cross and Blue Shield of Florida, Blue Cross and Blue Shield of Georgia, et al., Defendants-Appellees.**

No. 13-14250

United States Court of Appeals, Eleventh Circuit.

(April 5, 2017)

William Tucker Brown, Whatley Drake & Kallas, LLC, Birmingham, AL, Edith M. Kallas, Joe R. Whatley, Jr., Whatley Kallas, LLP, New York, NY, Stephen F. Rosenthal, Aaron S. Podhurst, Peter Prieto, Matthew P. Weinshall, Podhurst Orseck, PA, Miami, FL, Gail A. McQuilkin, Harley S. Tropin, Kozyak Tropin & Throckmorton, PA, Coral Gables, FL, for Plaintiffs-Appellants

James Louis Priester, Maynard Cooper & Gale, PC, Birmingham, AL, Carlos Francisco Concepcion, Elio F. Martinez, Jr., Concepcion Martinez & Bellido, Coral Gables, FL, for Defendant-Appellee Blue Cross and Blue Shield of Alabama

Carlos Francisco Concepcion, Elio F. Martinez, Jr., Concepcion Martinez & Bel-

lido, Coral Gables, FL, Gwendolyn C. Payton, Lane Powell, PC, Seattle, WA, for Defendant-Appellee Premera Blue Cross and Blue Shield of Alaska

Peter R. Bisio, E. Desmond Hogan, Craig A. Hoover, Hogan Lovells US, LLP, Washington, DC, N. Thomas Connally, II, Thomas M. Trucksess, Emily M. Yinger, Hogan Lovells US, LLP, McLean, VA, Julie E. Nevins, Stroock & Stroock & Lavan, LLP, Miami, FL, for Defendants-Appellees Anthem Blue Cross and Blue Shield of Connecticut, Blue Cross and Blue Shield of Florida, Blue Cross and Blue Shield of Georgia

Anaysa Gallardo, Cozen O'Connor, Miami, FL, for Defendant-Appellee Blue Cross of Northeastern Pennsylvania

Donald Bruce Hoffman, Hunton & Williams, LLP, Washington, DC, Paul C. Huck, Jr., Jones Day, Miami, FL, for Defendant-Appellee Blue Cross and Blue Shield of Michigan

John DeQ. Briggs, Rachel Adcox, Kenina J. Lee, Axinn Veltrop & Harkrider, LLP, Washington, DC, for Defendant-Appellee Independence Blue Cross

Patrick Peter de Gravelles, CareFirst BlueCross BlueShield, Washington, DC, for Defendant-Appellee CareFirst Blue Cross and Blue Shield of Maryland

Before TJOFLAT, JULIE CARNES and GILMAN,* Circuit Judges.

PER CURIAM:

After review and oral argument, we affirm the District Court's dismissal of the plaintiff-appellants' complaint under Federal Rule of Civil Procedure 12(b)(6) on the basis of the District Court's thorough

---

* Honorable Ronald Lee Gilman, U.S. Circuit Judge for the Sixth Circuit, sitting by designa-tion.

and well-reasoned order of August 20, 2013.

**AFFIRMED.**

TJOFLAT, Circuit Judge, concurring specially:

This case comes before us on appeal from an order of the United States District Court for the Southern District of Florida dismissing the plaintiffs' complaint for declaratory relief under Federal Rule of Civil Procedure 12(b)(6). The plaintiffs are three doctors who had previously been plaintiffs in class-action litigation (the "*Shane* and *Love* Litigation") and party to settlements with most of the defendants.[1] These settlements included broad releases of claims enforced by consent decree. Subsequently, the plaintiffs desired to join a different class action coalescing in the United States District Court for the Northern District of Alabama (the "*Conway* Litigation") asserting similar claims against many of the same defendants. The plaintiffs petitioned the Southern District of Florida for a declaratory judgment that the consent decrees from the *Shane* and *Love* Litigation did not bar them from joining the *Conway* Litigation. The District Court granted the defendants' motion to dismiss for failure to state a claim after determining that the consent decrees clearly enjoined them from joining the *Conway* Litigation.

I write separately because I would affirm the District Court on the grounds

that a declaratory judgment action is not the appropriate vehicle for determining the scope of a permanent injunction. The Declaratory Judgment Act was not intended to provide a route for circumventing the enforcement of an already-granted injunction. Allowing a declaratory judgment to issue for these purposes would significantly defang the injunction as a remedy, which would work a serious harm on the rule of law and the integrity of the judiciary. As such, no complaint filed for these purposes can properly state a claim for which declaratory relief may be granted, and I would affirm the order of dismissal on this basis.

I.

The plaintiffs in this case—Doctors Musselman, Shane, and Love—were plaintiffs in class-action lawsuits filed in the early 2000s against the entities of the Blue Cross Blue Shield (BCBS) network of health insurers. Those previous lawsuits were *In re: Managed Care Litigation*, No. 00-md-01334 (S.D. Fla.) ("*Shane*") and *Love v. Blue Cross and Blue Shield Association*, No. 03-cv-21296 (S.D. Fla.) ("*Love*"). The District Court presided over both *Shane* and *Love*, which involved substantively identical claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968[2] against different groups of health insurers.[3]

---

1. *See infra* note 5.

2. The health insurers allegedly altered their automated-payment systems to covertly undercompensate physicians for medically necessary services. *See Klay v. Humana, Inc.*, 382 F.3d 1241, 1246–50 (11th Cir. 2004) (summarizing the *Shane* plaintiffs' allegations). This scheme was made all the more effective, the plaintiffs alleged, due to the defendants' "overwhelming economic power and market dominance," which forced the plaintiffs into

doing business with the insurers despite their unsavory practices.

3. *Shane* was a consolidated multidistrict litigation against most of the country's major health maintenance organizations (HMOs), first filed in 2000. *Love* was a separate suit against the BCBS defendants in 2003. The same District Judge presided over both suits due to the Court's former Local Rule 3.9(c), which provided, "[w]henever an action ... is filed in the Court which involves subject matter which is a material part of the subject

Between 2005 and 2007, the BCBS defendants settled claims in *Shane* and *Love* in three separate settlement agreements—the WellPoint, Highmark, and Blue Cross Settlement Agreements. Of the thirty-six BCBS defendants in the present case, eight were parties to the WellPoint agreement,[4] two were parties to the Highmark agreement, and twenty-five were parties to the Blue Cross agreement.[5] The settlements all included broad releases of claims, which were nearly identical.[6] The District Court approved each settlement agreement, incorporated each into a court order,[7] and issued injunctions barring the plaintiffs who failed to opt out from ever prosecuting released claims against settling defendants.[8] The orders further pro-

---

matter of another action .... then pending before this Court, or for other reasons the disposition thereof would appear to entail the unnecessary duplication of judicial labor if heard by a different Judge, the Judges involved shall determine whether the newly filed action ... shall be transferred to the Judge to whom the earlier filed action or proceeding is assigned." That rule is now codified under Rule 2.15.00(c) of the Court's Internal Operating Procedure.

4. The eight parties to the WellPoint agreement were defendants in both *Shane* and *Love*, whereas the remaining parties were defendants only in *Love*. The WellPoint agreement settled both suits.

5. For those counting, only thirty-five of the BCBS defendants are accounted for, but there are thirty-six BCBS parties in the action below and on appeal. This is because Excellus Bluecross Blueshield of New York was not a party to any of the three settlement agreements or consent decrees, a fact *actually noted* in the *Conway* amended complaints—the lawsuit the doctors want to join. *See* Amended Complaint for Consolidated Provider Track, *In re Blue Cross Blue Shield Antitrust Litigation*, Doc. 86 at § 108 *MDL 2406*, No. 2:13-CV-20000 (N.D. Ala. July 1, 2013); Corrected Consolidated Second Amended Provider Complaint, Doc. 263 at § 134, *In re Blue Cross Blue Shield Antitrust Litigation MDL 2406*, No. 2:13-CV-20000 (N.D. Ala. Nov. 25, 2014). Its inclusion in these proceedings and failure to object is baffling.

6. A representative example of the broad releases granted by the plaintiffs in the *Shane* and *Love* Litigation comes from the Blue Cross Settlement:

> [T]he Blue Parties and each of their present and former parents, divisions, and Affiliates ... shall be released and forever discharged by the Signatory Medical Societies and all

Class Members ... from any and all causes of action, judgments, liens, indebtedness, costs, damages, obligations, attorneys' fees, losses, claims, liabilities, and demands of whatever kind, source, or character whether arising under any federal or state law, which (consistent with the Parties' understanding of the settlements in <u>Shane</u>) includes, but is not limited to, Racketeer Influenced and Corrupt Organizations Act, antitrust and other statutory and common law claims, intentional or non-intentional, (each a "Claim"), ... arising out of, or in any way related to any of the facts, acts, events, transactions, occurrences, courses of conduct, business practices, representations, omissions, circumstances, or other matters referenced in the Action, or addressed in the Settlement Agreement, whether any such Claim was or could have been asserted by any Releasing Party ... or to the business practices that are the subject of Section 7 of the Settlement Agreement. This includes, without limitation and as to Released Parties only, any aspect of any fee for service claim submitted by any Class Member to the Blue Plans.... [T]he Releasing Parties are deemed to have forever abandoned and discharged any and all Claims that exist now or that might arise in the future against any other Persons which Claims arise from, or are based on, conduct by any of the Released Parties that occurred on or before the Effective Date and are, or could have been, alleged in the Complaint.

7. Court orders that incorporate settlement agreements are commonly called consent decrees. This opinion will occasionally refer to the orders as consent decrees.

8. The District Court's Final Orders specified:

> The Releasing Parties are permanently enjoined from: (i) filing, commencing, prosecuting, intervening in, participating in (as

vided that "this Court hereby retains jurisdiction as to all matters relating to (a) the interpretation, administration, and consummation of the Settlement Agreement and (b) the enforcement of injunctions in this Order." No one disputes that Musselman, Love, and Shane failed to opt out of the agreements, and are therefore bound by the injunctions.

On July 24, 2012, a healthcare provider, Jerry Conway, filed a putative class-action suit against the BCBS defendants in the Northern District of Alabama. *Conway v. Blue Cross & Blue Shield of Alabama, et al.*, No. 12-cv-02532, 2012 WL 3202824 (N.D. Ala. July 24, 2012). Conway, on behalf of most of the nation's healthcare providers, alleges that the BCBS licensing and reimbursement arrangements violate the Sherman Act, 15 U.S.C. §§ 1–2.[9]

The plaintiff doctors in the present suit seek to join the *Conway* Litigation "as either putative class representatives or class members," but fear that the releases they gave to settle the *Shane* and *Love* Litigation may cover the claims asserted in *Conway*. Were they to join *Conway*, the doctors would risk being held in civil contempt for violating the District Court's orders.[10] Rather than take that risk, they

asked the District Court to determine in advance whether joining *Conway* would violate the injunctions by filing a declaratory judgment action on January 7, 2013.

The defendants moved to dismiss the plaintiff doctors' complaint under Federal Rule of Civil Procedure 12(b)(6). They argued that the *Conway* claims were within the subject matter and timeframe covered by the injunctions issued in the *Shane* and *Love* Litigation, and that the plaintiffs had thus not made out a claim for declaratory relief. The plaintiffs countered that the *Conway* claims covered different conduct occurring only after the Effective Date of the releases in the *Shane* and *Love* Litigation and thus fell outside the scope of the injunctions. The District Court agreed with the defendants and dismissed the complaint. The plaintiffs appealed from the District Court's order, and both sides presented arguments essentially identical to the ones made below.[11]

## II.

We are here faced with the question of whether the complaint seeking declaratory relief on the scope of the consent decrees issued in the *Shane* and *Love* settlements made out a claim for which declaratory

---

class members or otherwise), or receiving any benefits from any lawsuit ... based on any or all Released Claims against one or more Released Parties; (ii) instituting, organizing class members in, joining with class members in, amending a pleading in, or soliciting the participation of class members in, any action ... in any jurisdiction against one or more Released Parties based on, involving, or incorporating, directly or indirectly, any or all Released Claims.

9. The *Conway* Litigation alleges a conspiracy by the BCBS entities using their licensing agreement in which they agreed not to compete with each other and to divide the healthcare market into exclusive geographic fiefdoms so that they can systematically underpay healthcare providers.

10. This concern is not unfounded. The District Court has held former *Shane* plaintiffs in contempt for pursuing claims it determined to be released under the injunctions. *See, e.g., In re Managed Care*, 756 F.3d 1222, 1224–25 (11th Cir. 2014).

11. During the course of the appeal, we called for supplemental briefing to confirm that the District Court had jurisdiction over this suit. In their supplemental briefs, the parties addressed the scope of the declaratory judgment procedures created by the Declaratory Judgment Act, 28 U.S.C. § 2201. Those arguments provide the basis of this opinion.

relief could be granted under Rule 12(b)(6).

We review de novo orders granting a motion to dismiss for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 694 (11th Cir. 2016). When ruling on a Rule 12(b)(6) motion, the allegations in the complaint are accepted as true and construed in the light most favorable to the plaintiff, *id.*, yet the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). We may affirm a Rule 12(b)(6) dismissal on any basis supported by the record. *Jaffke v. Dunham*, 352 U.S. 280, 281, 77 S.Ct. 307, 308, 1 L.Ed.2d 314 (1957); *Michel*, 816 F.3d at 694.

I would conclude that the Declaratory Judgment Act does not permit a court to grant declaratory relief regarding the scope of an injunction and that any complaint seeking such a remedy does not state a claim on which relief can be granted. In enacting the Declaratory Judgment Act, Congress intended to create a remedy that is coextensive with—not in derogation of—remedies traditionally available at law and equity. At least under these circumstances, I must conclude that this implies an intended distinction between remedies and enforcement mechanisms for an already-granted remedy. This distinction is implied because using a declaratory judgment to plumb the scope of an injunction rather than bearing the risk of being held in contempt would allow the declaratory judgment to undermine the injunction as a remedy. Injunctions definitionally and as a matter of sound jurisprudential policy rely on the maintenance of the traditional enforcement mechanism of the court's inherent civil contempt power. Injunctions are carefully crafted with this enforcement mechanism in mind and thus ensure respect for the rule of law as resting upon the integrity of the judicial process. Therefore, a declaratory judgment cannot issue on the scope of an injunction such as this one.

This discussion will proceed in three parts. The first is a brief discussion of statutory interpretation principles. The second is an application of these principles to the Declaratory Judgment Act, which by necessity includes a discussion of the injunction as an independent remedy in relation to the Act. The third is an analysis of the complaint below under the Declaratory Judgment Act and Rule 12(b)(6).

### A.

Statutes in the United States "must be construed in the light of Congress' intent." *Federal Election Comm'n v. NRA Political Victory Fund*, 513 U.S. 88, 102, 115 S.Ct. 537, 545, 130 L.Ed.2d 439 (1994). This intent is divined primarily from the statute's language itself read according to the ordinary meaning of the words employed. *Lawson v. FMR LLC*, —— U.S. ——, 134 S.Ct. 1158, 1165, 188 L.Ed.2d 158 (2014). We also employ prudential cannons to ensure that we do not overrun congressional intent and threaten the stability of our legal system. One such cannon is that we assume that Congress is familiar with the background of common law, draws upon common law concepts, and only abrogates common law when and to the extent it clearly express intent to do so. *See, e.g., Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783, 72 S.Ct. 1011, 1014–15, 96 L.Ed. 1294 (1952) ("Statutes which invade the common law ... are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident"); *Shaw v. Merchants' Nat'l Bank*, 101 U.S.

557, 565, 25 L.Ed. 892 (1879) ("No statute is to be construed as altering the common law, farther than its words import. It is not to be construed as making any innovation upon the common law which it does not fairly express."); *United States v. Bellard*, 674 F.2d 330, 335 (5th Cir. 1982) ("Changes in or abrogation of the common law must be clearly and plainly expressed by the legislature; even where such an intention is explicit, the scope of the common law will be constrained no further than the fair import of the statute's language requires." (citations omitted)).

### B.

The Declaratory Judgment Act, 28 U.S.C. § 2201, allows a court "[i]n a case of actual controversy within its jurisdiction" and "upon the filing of an appropriate pleading, [to] declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." The statute was intentionally written so broadly as to create an optional remedy coextensive with those remedies traditionally available at law or equity. Fed. R. Civ. P. 57 Advisory Committee Note. Hence, Federal Rule of Civil Procedure 57 provides that "[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate."

The most commonly cited limitation on the Declaratory Judgment Act is one that is both constitutional in nature and apparent on the statute's face—that the court must have subject-matter jurisdiction over the underlying claim. *E.g. United Public Workers of Am. v. Mitchell*, 330 U.S. 75, 89, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947). Yet when considering the terms of the statute and the background of common law and equitable remedies to which Congress added the declaratory judgment, an addi-

tional—if subtle—limitation emerges that was no less clearly intended by Congress. In noting that the declaratory judgment "shall have the force and effect of a final judgment or decree" available "whether or not further relief is or could be sought," 28 U.S.C. § 2201, Congress plainly intended that the declaratory judgment serve as a primary remedy available for any underlying cause of action, *see* Fed. R. Civ. P. 57 ("The existence of another adequate remedy does not preclude a declaratory judgment...."); Fed. R. Civ. P. 57 Advisory Committee Note; 10B Charles Allen Wright et al., *Federal Practice and Procedure* § 2751 (4th ed. 2016) (noting that "[t]he remedy made available by the Declaratory Judgment Act and Rule 57" is designed to serve the same role as a "coercive remedy" only before coercion is necessary). *Cf. Black's Law Dictionary* 1485 (10th ed. 2014) (defining "remedy" as "[t]he means of enforcing a right or preventing or redressing a wrong; legal or equitable relief."). Designed as a remedy, therefore, it is crucial to mark that there is nothing in the statute that suggests that a declaratory judgment may also be used as an enforcement mechanism for a different remedy already granted in a suit. *See* 28 U.S.C. § 2201. This otherwise fine distinction takes on significantly greater force when considering Congress's clearly expressed intent that the declaratory judgment supplement—not supplant—remedies traditionally available at law or equity, Fed. R. Civ. P. 57 Advisory Committee Note, along with the prudential assumption that Congress only alters common law through clear expression of intent to do so, *e.g. Shaw*, 101 U.S. at 565.

One such traditional remedy is the injunction: a powerful equitable remedy that is defined by and whose strength primarily derives from its enforcement mechanisms. The Supreme Court itself

defines the injunction as "an equitable decree compelling obedience under the threat of contempt" under Federal Rule of Civil Procedure 65(d). *International Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 75, 88 S.Ct. 201, 209, 19 L.Ed.2d 236 (1967). We have repeatedly emphasized this link between injunctions and contempt, reminding litigants on numerous occasions that an injunction is enforceable through the trial court's civil contempt power.[12] *Mamma Mia's Trattoria, Inc. v. Original Brooklyn Water Bagel Co.*, 768 F.3d 1320, 1324–25 (11th Cir. 2014); *Alderwoods Grp. v. Garcia*, 682 F.3d 958, 966–68 (11th Cir. 2012); *Faught v. American Home Shield Corp.*, 660 F.3d 1289, 1293 (11th Cir. 2011); *Thomas v. Blue Cross & Blue Shield Ass'n*, 594 F.3d 823, 828–29 (11th Cir. 2010); *Reynolds v. Roberts*, 207 F.3d 1288, 1298 (11th Cir. 2000); *In re Grand Jury Proceedings*, 142 F.3d 1416, 1424 (11th Cir. 1998); *Wyatt v. Rogers*, 92 F.3d 1074, 1078 n.8 (11th Cir. 1996); *Newman v. Alabama*, 683 F.2d 1312, 1318–19 (11th Cir. 1982). In fact, the basic procedure for enforcing an injunction remains essentially unchanged since the days of Blackstone. *See* 3 William Blackstone, *Commentaries* *453 ("the performance of [the final decree of the chancery court] is en-forced (if necessary) by commitment of the person, or sequestration of the party's estate."). The reason that the contempt power is so integral to the injunction as a remedy is that it relieves courts from merely "hoping for compliance" with its order, and instead allows them to enforce the order through a fine[13] or conditional jail term. *Hutto v. Finney*, 437 U.S. 678, 690, 98 S.Ct. 2565, 2573, 57 L.Ed.2d 522 (1978). Accordingly, we have rejected past attempts to circumvent "equity's time-honored contempt procedure" through alternative means of seeking compliance with an injunction. *Newman*, 683 F.2d at 1318–19.

The dramatic strength of contempt proceedings as the enforcement mechanism of injunctions is supported by the underlying equitable process. The injunction "is not a remedy which issues as a matter of course." *City of Harrisonville v. W.S. Dickey Clay Mfg. Co.*, 289 U.S. 334, 337–38, 53 S.Ct. 602, 603, 77 L.Ed. 1208 (1933). Indeed, injunctions are only issued following the court's careful consideration and balancing of the parties' competing conveniences and injuries, and are not used " 'to restrain an act the injurious consequences of which are merely trifling.' " *Weinberger v. Romero-Barcelo*, 456 U.S.

---

**12.** In fact, we have spelled this out in great detail:

> If the plaintiff (the party obtaining the writ) believes that the defendant (the enjoined party) is failing to comply with the decree's mandate, the plaintiff moves the court to issue an order to show cause why the defendant should not be adjudged in civil contempt and sanctioned. The plaintiff's motion cites the injunctive provision at issue and alleges that the defendant has refused to obey its mandate. If satisfied that the plaintiff's motion states a case of non-compliance, the court orders the defendant to show cause why he should not be held in contempt and schedules a hearing for that purpose. At the hearing, if the plaintiff proves what he has alleged in his motion for an order to show cause, the court hears from the defendant. At the end of the day, the court determines whether the defendant has complied with the injunctive provision at issue and, if not, the sanction(s) necessary to ensure compliance.
>
> *Reynolds v. Roberts*, 207 F.3d 1288, 1298 (11th Cir. 2000) (citations omitted).

**13.** Among the financial penalties courts may use to enforce their injunctions is the "remedial fine, which compensates the party who won the injunction for the effects of his opponent's noncompliance." *Hutto v. Finney*, 437 U.S. 678, 690, 98 S.Ct. 2565, 2573, 57 L.Ed.2d 522 (1978).

305, 311–12, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982) (quoting *Consolidated Canal Co. v. Mesa Canal Co.*, 177 U.S. 296, 302, 20 S.Ct. 628, 630, 44 L.Ed. 777 (1900)). Courts are obligated to be highly circumspect throughout this process to ensure that "injunctive relief 'is drafted in light of what the court believes will be the future course of events,'" so that its order is not used to serve injustice. *Salazar v. Buono*, 559 U.S. 700, 714–15, 130 S.Ct. 1803, 1816, 176 L.Ed.2d 634 (2010) (quoting Charles Allen Wright et al., *Federal Practice & Procedure* § 2961 (2d ed. 1995)). Naturally, therefore, injunctions are generally hotly contested in litigation, *see Weinberger*, 456 U.S. at 312, 102 S.Ct. at 1803, or negotiated in settlement, Larry Kramer, *Consent Decrees and the Rights of Third Parties*, 87 Mich. L. Rev. 321, 325–26, so that the court will properly account for the parties' various interests, *Weinberger*, 456 U.S. at 312, 102 S.Ct. at 1803. Given the importance of the interests that injunctions are meant to protect, the elaborate decision-making process leading to their issuance, and the heavy involvement of the parties in their construction, it is not only logical but sound policy that injunctions have such a potent enforcement mechanism as contempt proceedings.

The longstanding doctrinal requirement of enforcing injunctions through contempt proceedings also supports the judiciary as an institution by inspiring respect for the rule of law as resting on the integrity of the judicial process. The threat of contempt proceedings inspires respect for the rule of law by serving as a strong incentive to interpret the mandate of the court in the best of faiths and to therefore treat the judiciary with the reverence that is its main source of strength. *See Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944) ("The historic injunctive process was designed to deter"). *Cf. Hutto*, 437 U.S. at 690–91, 98 S.Ct. at 2573–74 (discussing the "effective enforcement weapons" courts have for enforcing injunctions through their contempt powers so that they need not merely "hop[e] for compliance"). The parties can rest assured that the court took the parties' interests—through litigation or settlement—and the public into consideration and did not behave arbitrarily even though one or both of the parties might be unhappy with the content of the injunction. *See Salazar*, 559 U.S. at 714–15, 130 S.Ct. at 1816; *Weinberger*, 456 U.S. at 311–12, 102 S.Ct. at 1803. Indeed, knowing the process that underpins injunctions and the show-cause risk they bear if their actions incite another party to move the court to institute contempt proceedings, the parties have every reason to stick to the straight and narrow of the court's order. Furthermore, by relying on their inherent contempt power to enforce injunctions, courts remain faithful to their core competency, which guarantees the integrity of the judicial process. *See Newman*, 683 F.2d at 1319–20 (holding that a district court cannot forego a contempt proceeding in favor of enforcing its injunction by making the required action directly for the enjoined party). Thus, the linkage between the injunction and its enforcement mechanism extends to the very foundation of our legal system.

To interpret the Declaratory Judgment Act as extending to the interpretation of an already-issued injunction effectively undermines the efficacy of the injunction as a remedy while simultaneously eroding the integrity of the judiciary. The injunction is definitionally enforced by contempt, *International Longshoremen's Ass'n*, 389 U.S. at 75, 88 S.Ct. at 209, and to instead allow parties to test the waters anytime they think a contemplated action might be prohibited would irreparably degrade its extraordinary and equitable nature. Parties would no longer treat injunctions as deeply

considered mandates to which they must solemnly conform their conduct, but rather as pesky roadblocks to surmount via cease-less declaratory judgment actions. District courts would have less concern with craft-ing a considered and balanced order know-ing that regardless of the outcome the litigants would soon be back in court fuss-ing over the details. Permanent injunctions would no longer mark the end of a suit, but would instead inaugurate a whole new saga of litigation since an enjoined party's actions no longer have to be weighed against the hazard of contempt punish-ment. Thus, to treat the declaratory judg-ment not as an alternative remedy but rather as an alternative to the enforcement mechanism of an already-issued injunction is to reduce the efficacy of the injunction as a remedy and, in the process, to dimin-ish the integrity of the courts charged with issuing and enforcing them.

This is emphatically not what Congress intended when it passed the Declaratory Judgment Act. Congress intended to cre-ate a remedy to supplement—not sup-plant—the remedies traditionally available at law and equity. *See* 28 U.S.C. § 2201; Fed. R. Civ. P. 57 Advisory Committee Note. To allow the declaratory judgment to serve not just as a remedy but as an alternative to the longstanding enforce-ment mechanism of the injunction is to effectively supplant the injunction as a remedy. Although I am sure that many litigants might wish to use a declaratory judgment action like this one in a good faith attempt to comply with a court order, Congress designed this statute carefully so that it would contribute to the good func-tioning of the judiciary and its great and unbroken practices. Therefore, I would conclude that the Declaratory Judgment Act does not extend to circumstances such as these.

### C.

In this case, the District Court correctly dismissed the plaintiff doctors' complaint. Though the District Court ably analyzed the release incorporated by the injunc-tions, it did not need to reach that ques-tion, and I would thus affirm its ruling based on the record and my analysis of the Declaratory Judgment Act. *See Michel*, 816 F.3d at 694. That statute provides an alternative remedy for a cause of action, not an alternative enforcement mechanism for the injunction, *see* 28 U.S.C. § 2201, whose strength as a remedy relies on en-forcement through the court's contempt power, *e.g.*, *Hutto*, 437 U.S. at 690–91, 98 S.Ct. at 2573–74; *Newman*, 683 F.2d at 1318–19. By seeking a declaratory judg-ment on the scope of the consent decrees issued in the *Shane* and *Love* Litigation, the doctors have not stated a claim for which declaratory relief is available under the terms of the statute. Therefore, in no way have they "state[d] a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S.Ct. at 1974.

### III.

In conclusion, I would affirm the District Court's dismissal of the plaintiff doctors' complaint for failure to state a claim under Rule 12(b)(6) because a declaratory judg-ment action is not the appropriate action for determining the scope of an injunction.

GILMAN, Circuit Judge, concurring.

I write separately because I respectfully disagree with my learned colleague Judge Tjoflat, whose concurring opinion ques-tions the propriety of using a declaratory-judgment action as a means of determining the scope of the settlement agreements in this case. His assertion that "[a]llowing a declaratory judgment to issue for these purposes would significantly defang the in-junction as a remedy, which would work a

serious harm on the rule of law and the integrity of the judiciary" (Tjoflat Op. at 1) finds no support in the text of the Declaratory Judgment Act, the caselaw of this or any other circuit, or in the teachings of the Supreme Court.

To begin with, at no time in the course of the proceedings below did the plaintiffs, the defendants, or the district court question the propriety of using a declaratory-judgment action as the proper vehicle for declaring the plaintiffs' rights vis-à-vis the settlement agreements. This is an issue raised sua sponte by Judge Tjoflat. Yet the Declaratory Judgment Act, through which the plaintiffs brought their action, expressly enables the district court to "declare the rights . . . of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

The Supreme Court, moreover, has endorsed the use of a declaratory-judgment action under similar circumstances. *See, e.g., MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 137, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007) (holding "that petitioner was not required, insofar as Article III is concerned, to break or terminate its 1997 license agreement before seeking a declaratory judgment in federal court that the underlying patent is invalid, unenforceable, or not infringed"); *see also Abbott Labs. v. Gardner,* 387 U.S. 136, 152, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (noting "that it was the very purpose of the Declaratory Judgment Act to ameliorate" the plaintiff's dilemma of having to choose between abandoning his rights or risking prosecution), *abrogated on other grounds by Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

In a similar vein, this court and its sister circuits have noted that declaratory-judgment actions are an appropriate means of determining the scope of a settlement agreement or consent decree. *See Thomas v. Blue Cross & Blue Shield Ass'n,* 594 F.3d 823, 830–31 (11th Cir. 2010) (implying that the plaintiff should have filed a complaint for a declaratory judgment to determine whether his claims were released by the settlement agreement); *City of El Paso v. El Paso Entm't, Inc.,* 382 Fed.Appx. 361, 364–65 (5th Cir. 2010) (holding that the district court acted properly in "declar[ing] the rights of the parties pursuant to" a settlement agreement and permanent injunction by way of a declaratory-judgment action); *Peter Bay Homeowners Ass'n, Inc. v. Stillman,* 294 F.3d 524, 533 (3d Cir. 2002) (holding that "[c]learly, the District Court had jurisdiction to interpret the meaning and scope of the various obligations" imposed by an earlier court order by way of a declaratory-judgment action).

The only jurists who appear vexed by the use of the declaratory-judgment action in this or a similar setting are Judge Tjoflat, in his concurring opinion in this case, and Justice Clarence Thomas, who was the sole dissenter in *MedImmune. MedImmune,* 549 U.S. at 137, 127 S.Ct. 764 (Thomas, J., dissenting) (arguing that Article III requires that a "patent licensee . . . must breach its license prior to challenging the validity of the underlying patent pursuant to the Declaratory Judgment Act"). To the contrary, the authorities that I have cited comport with the common-sense idea that the courts should not force parties to be cited for contempt in order to ascertain the scope of a consent decree. *Id.* at 129, 127 S.Ct. 764. Declaratory-judgment actions, after all, are designed to avoid such dilemmas. *Id.*

Nor do I see any basis for concern over subject-matter jurisdiction in this case. That the plaintiffs sought to join the *Conway* action in Alabama was enough to make the question before the district court "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *See Maryland Cas. Co. v. Pac. Coal & Oil Co.,* 312

U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941). Contrary to Judge Tjoflat's concerns, Article III's case-or-controversy requirement will ensure that any sustainable declaratory-judgment action will be based on a material dispute rather than a mere "fussing over the details." (Tjoflat Op. at 15) That test has been clearly met in the present case.

Judge Tjoflat, however, gravely warns that "[p]arties would no longer treat injunctions as deeply considered mandates to which they must solemnly conform their conduct, but rather as pesky roadblocks to surmount via ceaseless declaratory-judgment actions." (Tjoflat Op. at 15) But he cites no authority for these fears, and I would draw just the opposite conclusion. That the plaintiffs in the case before us sought a declaration of their alleged rights rather than risk being cited for contempt strikes me as showing a very deep respect for the injunction issued by the district court. In sum, I believe that the use of the Declaratory Judgment Act was a completely appropriate procedure in the present case.